FIRST NATIONAL BANK OF HINTON *v.* P. W. TATE *et al.*

(No. 8066)

Submitted February 20, 1935. Decided March 5, 1935.

A. D. Daly and Frank Lively, for appellants.

Maxwell, Sayre & Bowers, Wm. H. Sawyers and W. Earle Crank, for appellee P. W. Tate.

KENNA, JUDGE:

The First National Bank of Hinton filed its bill of inter-pleader in the circuit court of Summers County alleging that John B. Tate at the time of his death on March 16, 1926, had on deposit in the savings department of the bank the sum of $8,999.59; that he died without descendants and intestate, leaving surviving him his mother, Ella E. Tate, since deceased, and P. W. Tate, W. H. Tate, E. R. Tate and Thomas J. Tate, brothers, each of whom plaintiff is now advised is entitled to a one-fifth undivided interest in the estate of John B. Tate; that thereafter, the plaintiff honored checks of Ella E. Tate in the total of $1,000.00 and that, with that deduction and after adding interest on the fund represented by the deposit in the name of John B. Tate to April 10, 1933, the date upon which the plaintiff qualified as his administrator, his estate represented by the money in the hands of the bank amounted to $10,809.31; that plaintiff is advised that Ella E. Tate died on the 26th day of February, 1933, leaving a will by which P. W. Tate was made the sole beneficiary, W. H. Tate, E. R. Tate and Thomas J. Tate receiving nominal bequests of one dollar each, and that the will of Ella E. Tate has been pro-bated in Louisa County, Virginia.

The bill further alleges that P. W. Tate in his own right and as executor of Ella E. Tate, deceased, has sued the plain-tiff by notice of motion in the circuit court of Summers County for the amount of the deposit held by it, the said notice of motion relying upon the passbook of the bank showing the deposit in the name of Ella E. Tate.

The bill of complaint further avers that after the death of John B. Tate, an employee of the plaintiff bank in charge of the transaction was advised that the mother of John B. Tate was entitled to the whole of his estate, and that P. W. Tate upon visiting the bank of plaintiff furthered that false im-pression, and procured a passbook to be made for the entire deposit to Ella E. Tate, having the transfer of the fund dated back to a time a few days before the death of John B. Tate, and that it was while the plaintiff was under this false im-pression that the entire amount descended to Ella E. Tate that

her checks were honored in the sum of $1,000.00; that immediately upon learning of that error, which was at the time that the administrator was appointed for the estate of John B. Tate on April 10, 1933, plaintiff gave written notice by letter mailed to P. W. Tate of the appointment of an administrator for John B. Tate, and of the transfer of the account to the administrator's name and of the fact that distribution would be made according to a legal finding as to who the beneficiaries of the estate of John B. Tate in fact were. The letter demanded the return of the passbook held by P. W. Tate as executor of the estate of Ella E. Tate, which was refused.

The bill goes on to allege that W. H. Tate, E. R. Tate and Thomas J. Tate have each notified the plaintiff that they are entitled, respectively, to one-fifth of the fund in its hands as distributees of the estate of John B. Tate, deceased. The bill concludes with the usual averment of the willingness of the stakeholder to distribute the fund in accordance with the decree of the court, and prays that an injunction may be granted restraining the prosecution of the notice of motion.

P. W. Tate filed a lengthy answer to this bill of complaint, the averments of which we do not think it is necessary to repeat in detail, deeming it sufficient to state that the principal issues raised in the case and to be decided here are (1) the place of residence of John B. Tate at the time of his death, and what law governs the distribution of his estate; (2) whether or not there was laches on the part of W. H. Tate, E. R. Tate and Thomas J. Tate in not having asserted their rights, if any they have, in the estate of John B. Tate at the time of his death in 1926, until the time of this suit.

Answers were also filed by W. H. Tate and E. R. Tate.

Proof was taken on the question of the domicile of John B. Tate at the time of his death and on the question of laches.

The trial court found that P. W. Tate, in his own right and as the executor of Ella E. Tate, was entitled to recover in full the amount in the hands of the bank, basing its decree upon the conclusion that John B. Tate was domiciled in Virginia at the time of his death. W. H. Tate, E. R. Tate and Thomas J. Tate prosecute this appeal, contending that the proof shows

that John B. Tate was domiciled in West Virginia at the time of his death.

The proof shows that John B. Tate died in Hinton in March, 1926, unmarried, intestate, owing no debts of consequence, and with about $8,500.00 on deposit in the savings department of the First National Bank of that city. He came to Hinton from Louisa County, Virginia, in 1905, when about fifteen years of age, and in 1906, began working there, apparently for the Chesapeake & Ohio Railway Company. At the time of his death, he had been a brakeman employed by that company on a freight run between Hinton and Clifton Forge, Virginia, for several years. For a period of five or six years, he had rented a furnished room in the town of Hinton from Mrs. J. C. Durette, which he had paid for by the month and had occupied until the time of his death. When in Clifton Forge, at the other end of his run, he either slept in the caboose of his train or stayed at the Y. M. C. A. During the period that John B. Tate was working out of Hinton for the Chesapeake & Ohio Railway Company, his mother, Ella E. Tate, and his brother, P. W. Tate, lived on a small farm in Louisa County, Virginia. John B. Tate referred on many occasions to the place in Virginia as his home, but his brother, E. R. Tate, who is interested here in establishing a West Virginia domicile for John B. Tate, testified that in 1919 John had told him that he expected to make his home in Hinton and never expected to return to Virginia to live. On one occasion, he declared that he could not vote in West Virginia. John B. Tate returned to the Virginia place two or three times a year, apparently for short visits. In 1912, he returned to the Virginia place and there remained for three weeks assisting his brother, P. W. Tate, to build a house, the expense of which was divided between them, for the mother and P. W. Tate to live in. In 1918, he was stricken with tuberculosis and remained at the Virginia place from about the first of July until sometime in August, when he went to Colorado for his health and there remained for thirteen months. He resumed his occupation with the Chesapeake & Ohio Railway Company in the fall of 1919, and returned to Virginia to spend Christmas that year. He paid no taxes in Virginia and was

not registered to vote there. He sent money home to his brother, P. W. Tate, to assist in the maintenance of his mother, as did the other brothers residing in West Virginia. He was solicitous about being registered as a qualified voter in Hinton on at least two different occasions and caused inquiry to be made to verify the fact that he was registered. He voted in Hinton on at least two occasions, and possibly three, the last probably being the general election which immediately preceded his death. He maintained a room, furnished by himself, in the house in Virginia in which he was accustomed to stay when he went there, and which was used by no other person on account of the fact that John B. Tate had tuberculosis. The circumstances of his last illness are not fully shown, but it was to a hospital in Hinton that he went and there he died.

The first proposition urged in favor of sustaining the decree of the trial court is that a person not *sui juris* cannot, by his own act, change his domicile, and that the domicile of origin persists so that the burden is upon him who asserts that it has been changed. These propositions are sound and need no citation of authority. John B. Tate became of age during the period under consideration. The question is whether this record contains proof sufficient to establish the domicile of John B. Tate at the time of his death as being in Hinton. This must affirmatively appear before it will be proper to reverse the decree of the trial court based upon a Virginia domicile.

Domicile ordinarily follows residence. *Ennis et al.* v. *Smith et al.*, 14 How. 400, 423, 14 L. Ed. 472; *Mitchell* v. *U. S.*, 21 Wall. 350, 352, 22 L. Ed. 584; *Anderson* v. *Watt*, 138 U. S. 694, 706, 11 S. Ct. 449, 34 L. Ed. 1078; *Mowry* v. *Latham*, 17 R. I. 480, 23 Atl. 13; *Harrison* v. *Harrison*, 117 Md. 607, 614, 84 Atl. 57, 59; *Re Coppock*, 72 Mont. 431, 234 P. 258, 39 A. L. R. 1152, 1153. There can be only one domicile, but it seems that that fact is consistent with the maintenance of more than one residence. Fixing the place of domicile of a single man, perhaps without church, lodge, social or community interest, is particularly difficult. However, it seems plain here that John B. Tate, as between the farm in Louisa County, Virginia, and Hinton, West Virginia, spent a great deal more of his time in the latter place, and that he there

maintained the establishment that might be referred to as his "living quarters". He missed very little time from his work, and maintained no establishment at the other end of his railroad run at Clifton Forge, Virginia. The details of his railroad work and the amount of time spent at Clifton Forge do not clearly appear, but the inference that as between Clifton Forge and Hinton, John B. Tate spent no more time away from Hinton than was absolutely necessary, it seems to us, may fairly be drawn from the fact that he either rented a room at the Y. M. C. A. or remained in the caboose of his train when he stayed at Clifton Forge. We are of opinion that, in so far as his place of residence is to be determined by his presence and the nature of the establishment maintained by him, residence, under the proof, must be fixed as Hinton. It has been held that proof of residence elsewhere is sufficient to overcome the presumption that the domicile of origin continues. *Ennis et al.* v. *Smith et al.,* 14 Howard 400, 423, 14 L. Ed. 472. See also the case of *Mowry* v. *Latham,* 17 R. I. 480, 23 Atl. 13, in which, upon facts loosely similar to those here presented, the presumption of the continuance of the domicile of origin was held to be overcome in the case of a person *non compos* for whom a guardian had been appointed.

But, in fixing his domicile as between Louisa County, Virginia, and Hinton, West Virginia, even if we say that the matter of residence is not necessarily controlling on account of the conflict between the presumption in favor of original domicile and the presumption that domicile follows residence, we may go further and inquire: Does the proof in the case in addition to residence at Hinton sufficiently show that, coupled with such residence, John B. Tate entertained the purpose to remain a resident of Hinton indefinitely? We think it does. The United States Supreme Court has said by way of dictum that the fact of voting is controlling on this question. *Shelton* v. *Tiffin,* 6 How. 163, 185, 12 L. Ed. 387. (A peculiar circumstance is that this case is *quoted* in *Easterly* v. *Goodwin,* 35 Conn. 279, 285, 95 Am. Dec. 237, as stating the exact contrary.) This, likely, is not in accord with the greater number of decided cases. *East Livermore* v. *Farmington,* 74 Me. 154;

*Easterly* v. *Goodwin,* 35 Conn. 279, 285, 95 Am. Dec. 237;
*Folger* v. *Slaughter,* 19 La. Ann. 323; *Hayes* v. *Hayes,* 74 Ill.
312, 315; *Quinn* v. *Nevills,* 7 Cal. App. 231, 93 Pac. 1055,
1056; *Harrison* v. *Harrison,* 117 Md. 607, 615, 84 Atl. 57, 59.
However, we feel that under the peculiar circumstances of
this case, and the closeness of the question on the other facts
shown, here, if not conclusive, it is at least entitled to con-
siderable weight. No circumstances are shown that cast doubt
upon the *bona fides* of his claim to West Virginia citizenship
at the times he voted. It is urged that his declaration that he
could not vote in this state is contradictory of the proof to the
effect that he did vote here. The witnesses who testified to
his declaration concerning his having no right to vote in West
Virginia did not fix the time of that statement within several
years. We therefore think that it is a fair assumption that
that statement was made before he actually voted in West
Virginia. Viewed in this light, we think that the statement
shows that John B. Tate realized that his right to vote in
this state depended upon a *bona fide* purpose to acquire
citizenship here and lends additional weight on that question
to the fact that he afterward did vote here. He maintained
a large savings account in a Hinton bank. He had come to
Hinton seeking employment and had been employed at that
place almost without interruption for twenty years. There is
testimony of his declared purpose to make West Virginia his
place of residence and not to return to Virginia to live. It
seems to us that these circumstances, together with the proof
of residence, are sufficient to overcome the presumption in
favor of the domicile of origin and to establish his domicile
in Hinton.

It is urged that after lapse of approximately seven years,
those now seeking to assert claims based upon a West Vir-
ginia domicile are barred by laches, growing out of the West
Virginia statute of limitations of five years for open accounts.
It seems to us that this argument is not applicable because
the question before us is a question of title to property, and
not that of a contractual demand against the estate. On the
question of laches, we cannot see that any person has been
misled by the delay nor that the delay has operated to

prejudice anyone. Disappointed hopes are not a sufficient basis upon which to predicate laches, but there must be a delay that prejudices. *Carter* v. *Carter,* 107 W. Va. 394, 395, 148 S. E. 378; *Tetrick* v. *McIntire,* 110 W. Va. 529, 532, 158 S. E. 788; *Lewis* v. *Milam,* 113 W. Va. 549, 552, 169 S. E. 70. Furthermore, the delay seems to have been occasioned by a misconception of their rights on the part of W. H. Tate, E. R. Tate and Thomas J. Tate brought about in large measure by the conduct of. P. W. Tate, who now invokes the rule against them. It was he who made the arrangements for the transfer of the bank account to the name of Ella E. Tate shortly after the death of John B. Tate and it is upon the result of a transaction conducted by himself that he now seeks to base a bar to the others.

It is further urged that on account of some sort of a misunderstanding which occurred immediately after the death of John B. Tate and on the occasion of the visit of his brother, P. W. Tate, to the Bank of Hinton for the purpose of settling his affairs, this money was paid to Ella E. Tate under a mistake of law on the part of W. H. Tate, E. R. Tate and Thomas J. Tate, and cannot now be recovered by them. Exactly what occurred at the bank is not clear, but it seems that upon P. W. Tate coming there shortly after the death of John B. Tate for the purpose of settling his brother's affairs, he was advised by an officer of the bank, after the bank's attorney had been called over the telephone, that the entire amount of John B. Tate's estate passed to his mother, Ella E. Tate. It is not clear whether this advice was given under the impression that the statutes of West Virginia so provided and that John B. Tate was a resident and domiciled in this state at the time of his death, or whether it was given under the impression that John B. Tate was a resident of the state of Virginia and that the Virginia statutes would control. In the first stated case, the advice would have been given pursuant to a mistake of law as to what the West Virginia statutes provided: in the second case, the advice would have been given under a mistake of fact as to where John B. Tate was domiciled at the time of his death. Perhaps it is just as plausible from this record to conclude the one as the other,

but we do not believe that we are called upon, in the circumstances, to definitely decide that question. We do not believe that there was a valid payment made at any time to Ella E. Tate. Certainly, the conduct of the bank in dating back a transfer of the account of John B. Tate to Ella E. Tate to a date several days before the death of the former can receive no legal sanction. It was entirely without authority, and inasmuch as that is so, we feel that the money on deposit must now be treated as though it had remained in the bank in the name of John B. Tate.

Perhaps an interesting question could have been presented on this record as to the competency, under the provisions of Code, 57-3-1, of P. W. Tate, W. H. Tate, E. R. Tate and Thomas J. Tate to testify to personal transactions had by them with John B. Tate in his lifetime. Because of the fact that the point is not raised on the record made up in the trial court and is not briefed here, and the further fact that the incompetent testimony, if any there be, was offered and received in evidence on both sides of the controversy, this decision does not deal with the question.

A further question is whether the trial court was correct in allowing interest against The First National Bank of Hinton from the first day of January, 1933, until the amount of the decree should be paid. Since this allowance of interest was made on the basis of the trial court's finding on the main question involved, we are of opinion that the question of interest should be re-examined in the light of the conclusion reached in this court and such further developments of the proof as the trial court may deem the question demands. The decree is therefore reversed in this respect as well.

We see no error in the allowance made to W. T. Fredeking for his services as the administrator of the estate of John B. Tate, deceased, in view of the conclusion here reached.

Being of the opinion that John B. Tate was domiciled in West Virginia at the time of his death and that therefore the laws of West Virginia govern the distribution of his estate, the decree of the circuit court of Summers county is reversed and the cause remanded for further proceedings in accord herewith.

*Reversed and remanded.*