495 P.2d 1379

**STATE of New Mexico ex rel. A. L. Happy APODACA and A. L. Happy Apodaca, Relators,**

v.

**Betty FIORINA, Secretary of State of the State of New Mexico, and David L. Norvell, Attorney General of the State of New Mexico, Respondents.**

No. 9454.

Supreme Court of New Mexico.

April 18, 1972.

Standley, Witt & Quinn, Bigbee, Byrd, Carpenter & Crout, Paul D. Gerber, Santa Fe, for relators.

David L. Norvell, Atty. Gen., William S. Dixon, Special Asst. Atty. Gen., Albuquerque, for respondents.

OPINION

PER CURIAM.

Relators petitioned for a writ of mandamus requiring Respondent Secretary of State to certify only the names of persons who paid the filing fees prescribed by § 3-8-26, subd. A, N.M.S.A., 1953 (Repl. Vol. 1, 1970) as candidates in the primary election scheduled to be held June 6, 1972, or, alternatively, to certify only those who would tender such fees within such time and under such conditions and restrictions as we might prescribe. It appears from the petition that the Respondent Attorney General has advised the Secretary of State to proceed in a different manner.

We issued our Alternative Writ which, following a lengthy evidentiary hearing and elaborate briefs and arguments of counsel, was made permanent with provision for permitting persons who had attempted to file as candidates without paying filing fees to pay the fees to the appropriate authority within a prescribed time. Finally, our permanent writ made it clear that Messrs. Orlin Cole, Malcolm Dillon and Clarence Gailard were unaffected by anything we said.

A complex course of events has gone before. In Federal District Court, Messrs. Dillon, Cole and Gailard brought an action against Mrs. Fiorina in which they asserted a desire to become candidates for the Democratic nomination to the office of United States Senator, claiming to be unable to pay the filing fees required by § 3-8-26, subd. A, supra. As a result, they claimed to be deprived of equal protection of the laws. Dillon v. Fiorina, 340 F.Supp. 729, U.S.D.C.N.M., issued March 24, 1972.

Trial was had before a three-judge panel. Attorney General Norvell purportedly defended Mrs. Fiorina. No evidence was tendered to show that the filing fee is "reasonably necessary to the accomplishment of legitimate state objectives." The three-judge panel handed down a Memorandum Opinion and entered a Final Judgment restraining Mrs. Fiorina from enforcing § 3-8-26 subd. A, supra, against the mentioned gentlemen if any of them "files an application to become a candidate for nomination for the office of United States Senator in the next primary election."

The Attorney General did not appeal Dillon nor seek a stay. He has not appeared before us in these proceedings.

On March 20, 1972, Respondent Norvell issued a Memorandum Directive on primary election procedures to the Governor and Mrs. Fiorina which instructed Mrs. Fiorina that "no filing fees should be assessed any candidate, otherwise qualified for the offices covered by Section 3-8-26(A) and (B) * * *." Section 3-8-26, subd. A encompasses all salaried officers to be elected in the upcoming primary. It does not relate to members of the legislature, members of the State Board of Education and County Surveyors, offices with which we are not here concerned.

Filing day, April 4, 1972, was not uneventful. For the office of United States Senator, twenty-eight candidates filed for the Democratic nomination and twelve for the Republican. Of these, three Democrats and one Republican paid filing fees.

Similar activity took place in the races for both congressional districts, the judicial races, and so on through the list. In the race for State Corporation Commission, eleven Democrats and three Republicans filed, of whom four Democrats, including Relator, paid filing fees.

Thereafter, on April 7, 1972, Relator petitioned for an alternative writ, which was issued on the same day.

Article VII, Section 1 of the New Mexico Constitution provides in pertinent part:

"The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections, and guard against the abuse of elective franchise."

In Bullock v. Carter, 405 U.S. 134, 92 S. Ct. 849, 31 L.Ed.2d 92 (1972), the court said:

"The Court has recognized that a State has a legitimate interest in regulating

the number of candidates on the ballot. Jenness v. Fortson, 403 U.S. 431, at 442, 91 S.Ct. 1970, 29 L.Ed.2d 554; Williams v. Rhodes, 393 U.S. 23, at 32, 89 S.Ct. 5, 21 L.Ed.2d 24. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting without the expense and burden of runoff elections. Although we have no way of gauging the number of candidates who might enter primaries in Texas if access to the ballot were unimpeded by the large filing fees in question here, we are bound to respect the legitimate objectives of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies. Jenness v. Fortson, 403 U.S., at 442, 91 S.Ct. 1970, 29 L.Ed.2d 554."

. The Chief Justice recognized in a subsequent statement that it is the "serious candidates" with whom we are concerned. He perceptively pointed out that:

" * * * And even assuming that every person paying the large fees required by Texas law takes his own candidacy seriously, that does not make him a 'serious candidate' in the popular sense. * * *"

■ Taken as a whole, having in mind the constitutional mandates laid down by the New Mexico Constitution, the recognition of the legitimate objectives of avoiding overcrowded ballots and the Chief Justice's comments concerning "serious candidates," the reasonable result is that it is . not merely the frivolous or fraudulent candidacies which may constitutionally be excluded, but also those candidates who are not "serious."

We accept the New Mexico constitutional mandate and the pronouncements of the United States Supreme Court in Bullock as our guidelines in arriving at our decision.

The precise question presented in this case for determination concerns § 3-8-26(A), supra, which provides:

"The filing fee for each of the following offices is:

"A. All officers receiving salary ----------------6% of the first year's salary."

■ The Respondents urge that this section is unconstitutional and void as a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. This enactment of the statute constitutes New Mexico "State action." Bullock v. Carter, supra.

For good or ill, this is an elected court. It is thus inevitable that no matter what result we might have reached, there would be those who would say that we had favored one candidate over another, or one party over another, or one social philosophy over another. This is a cross we accepted with our certificates of election. It is, nevertheless, true that our selective process has placed us in contact with the stream of governmental and political life in New Mexico, and in touch with its realities and practical concepts.

New Mexico political history and legislative attempts to regulate elections are fascinating subjects. Three percent filing fees have been tried but found wanting. The modest expenditure was not sufficient to preclude the filing of "stooge" candidates. In New Mexico political parlance, a "stooge candidate" is one who is filed by, or whose filing is caused or procured by a candidate or his adherents with a view to dividing the vote which would presumably be garnered by his opponent. Such efforts often developed along ethnic lines. For instance, a Spanish-speaking candidate would be filed to "split the native vote" to the supposed disadvantage of a serious contender of that lineage, which would be countered by filing a candidate "to split the Anglo vote," and so on and on.

This was an evil which resulted in confusion of the electorate and an abuse of the elective franchise.

The same abuses have been noted in respect to nominating petitions. In Bokum v. Romero, No. 5307 on the docket of this court, it was asserted that nominating petitions containing 1,067 signatures had been signed with the name of the candidate and the office sought left blank, or that the name and office had been erased and the petitions then completed, using the name of an individual apparently seeking the office of governor. The point of this evolution was popularly supposed to be to "split the Anglo vote." This court ruled the candidate off the ballot, and the next legislature returned to a pre-primary arrangement.

The evolution of legislative acts regulating the means of securing party nominations to office is also of interest, reflecting the efforts of the legislature to comply with the constitutional mandate set forth in Article VII, § 1 of the New Mexico Constitution to eliminate abuses and to refine and perfect the selective process.

Prior to 1938, nomination was by convention. In that year, a primary law was adopted which required a filing fee of three percent of the first year's salary. The search for a means of confining the ballot to serious candidates has led us from the original petitions with a three percent fee through pre-primary conventions with a three percent fee after convention selection (and nominating petitions with a similar fee as an alternate to convention selection) to a declaration of candidacy with a three percent fee without petitions.

Ultimately, passing over various intervening legislative episodes, § 3–8–26, subd. A was passed, which requires a filing fee of six percent of the first year's salary, accompanied by § 3–8–27, N.M.S.A., 1953 (Repl. Vol. 1, 1970), which provides for refund of one-half of the filing fee to a candidate who receives at least fifteen percent of the vote cast by members of his party in the race for the office he seeks.

Radically different from the Texas system recounted in Bullock is the filing fee structure in New Mexico and the use made of such fees.

In New Mexico, the parties do not pay for the primary. Rather than a sum arbitrarily fixed by party officials, a statutory six percent of the first year's salary must be initially paid. For candidates receiving fifteen percent of his party's votes in that race, one-half is refunded, leaving a net of three percent.

One-half of the filing fees of the serious candidates and all of the filing fees of candidates who do not receive fifteen percent of the vote are apportioned among the counties to partially defray the costs of conducting the primary election at the county level. In the 1970 primary, for example, $52,140 came from this source. Even at the county level, the fees do not cover the entire costs. Rather, the election fund receives revenues from other sources, including property taxes. In 1970, these funds amounted to $107,969. Thus, of the total sums which went into the county election funds for expenses at the county level, less than one-third was received from filing fees paid to the Secretary of State.

Moreover, no portion of such fees is used to defray the expenses of the Secretary of State's office, the principal function of that office being the administration and coordination of elections, (Chapter 3, Article 2, et seq., N.M.S.A.1953), or of the election bureau, a department or division of that office. The Secretary of State's office is supported by appropriations from the State's general fund.

Thus, as contrasted with Texas, the filing fees of candidates do not pay for primaries, except in part. Rather, the primary process is subsidized in substantial, though undisclosed, amounts by the State and various other sources of revenues which are made available for such purposes.

It is nevertheless true that if budgeted sums are not received by the counties from candidates' filing fees, the conduct of the election will deplete other funds of the counties, requiring curtailment of services

or diminution of other expenses such as personnel or salary cutbacks in most, if not all, of the counties.

■ Sections 3–8–26 and 3–8–27, supra, represent in significant measure the efforts of our legislature to achieve the legitimate objective of avoiding overcrowded ballots and protecting the integrity of the state's political processes.

A number of conclusions may be drawn from the refund statute. First, it obviously, by imposing a risk, seeks to discourage other than serious candidates. This is a legitimate objective pursued in a reasonable way. Respondents have inveighed against the risk element. Enterprises of consequence are usually accompanied by risk. We perceive no reason why elections should be otherwise.

We further can, and do, construe the refund statute as specifying the legislative measure by which to gauge a serious candidate, viz., one who garners fifteen percent of the vote. We regard this determination as being liberal. The percentage is very modest. It permits six serious candidates to contend for one office. This is ample and consistent with our constitutional mandate and Bullock.

■ Thus, as to the New Mexico scheme of filing fees, we first hold that the amount required to be paid involves no element of arbitrary or capricious discrimination against or among candidates, as was the case in Bullock. We further hold, in light of present day monetary values, that the amounts are by no means unreasonable. The modest six percent does not leap from the page as does the 99.7 percent Texas fee for one office recounted in Bullock.

Obviously, as to the solvent candidate, the fee required, though by no means unreasonable or exorbitant, is in an amount sufficient to give pause to one who is not a serious candidate. No one seems very much concerned about the solvent individual one way or the other, and we will therefore pass on to a consideration of candidates of lesser means.

Wealth is not a prerequisite to a successful seeking of elective office in New Mexico. In fact, it might reasonably be said that New Mexico has something of a tradition that candidates of modest means can achieve success. The evidence makes this clear.

Mr. Mike Anaya, the State Chairman of the Democratic Party, testified that in his extensive experience at both the county and state levels, no serious candidate has been precluded from seeking office by the filing fee requirement. Mr. Fabian Chavez, who has sought a number of offices, usually successfully at least through the primary stage, testified to like effect. He stated that he had often announced his candidacy and commenced his campaign without funds with which to pay the statutory filing fee, but that raising the fee had never presented a problem. Neither Mr. Anaya nor Mr. Chavez knew of any serious candidate who has ever been precluded from seeking office by lack of funds with which to pay the filing fee.

Thus viewed in its true light vis-a-vis the candidate of modest means, the filing fee requirement is not designed, nor does it have the effect of, precluding his entree to the ballot, provided he is a serious candidate. In the case of the impecunious candidate, the filing fee thus does not test his pocketbook, but rather, the extent of his support. If he does not have the requisite support, he does not gain entree to the ballot and no harm is done because he had no occasion to be there. Yet, if he is a serious candidate, the filing fee is no impediment.

We find as a matter of fact that in New Mexico the serious candidate precluded from entree to the ballot by lack of funds does not exist.

In primary elections, by their nature, more candidates' names appear on the ballot than is the case in general elections. It is clear from the evidence, as well as from the court's personal experience, that this involves longer periods of time in the voting machines for the voter, and that in pri-

maries; polling places become crowded and the waiting lines become long and restive.

In recognition of this, our statutes provide for a maximum of three and one-half minutes as the time period the voter may occupy the machine. Section 3–12–43, N. M.S.A., 1953. It is, nevertheless, common knowledge, and the evidence clearly shows, that in primaries numerous voters, for whatever reason, do not or cannot wait their turn at the polling places and depart without having voted.

These problems would obviously be compounded by the ballot in its present form. A worksheet introduced in evidence which had been prepared for a Bernalillo County precinct, showed a total of 216 spaces would be occupied by candidates' names. The evidence clearly demonstrates and we find that to permit matters to stand as they are would result in a large, though unknown and unascertainable, number of voters being deprived of their elective franchise. Certainly, these would number at least in the hundreds and in all likelihood in the thousands.

Under the guidelines we have announced, more particularly Bullock, the State, in discharging its obligations, may exclude candidates who are not serious. Conversely, the exclusion of non-serious candidates does not deprive them of any federally recognized constitutional right because such exclusion is a discharge of the obligations of the State to provide its electorate with an uncluttered ballot. This leaves to us a resolution of the question as to who is and who is not a serious candidate. Obviously, this is not a matter susceptible to precise definition, but one must be a candidate with some substantial support for his candidacy among the electorate. Section 3–8–27, supra, however, furnishes a figure of fifteen percent of the vote as a prerequisite to refund of one-half of the filing fee. That statute, in conjunction with § 3–8–26, subd. A, supra, requiring payment of the filing fee, working together, have proven an effective means of segregation between the serious and non-serious candidates.

There is certainly a valid interest in requiring some preliminary showing of a "significant modicum" of support before printing the name of a political organization and even more importantly the names of its candidates on the ballot. Jenness, et al. v. Fortson, Secretary of State of Georgia, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554.

It is suggested that we should refrain from all action, leaving corrective measures to the legislature. The inference seems to be that we are only concerned with one primary election—a matter of small consequence, and that somehow the electorate will muddle through.

Certainly alterations in the primary scheme may be appropriate and, if so, legislative action is clearly indicated. But we do not view our responsibilities so lightly. As matters stand, the electorate is in jeopardy of being deprived of the benefits of the constitutional mandates that the elective franchise be free from abuse and to an uncluttered ballot.

It may be true that our immediate concern is with one primary election which will soon be history, but its effects will linger on, because emerging from the miserable shambles which exists will be nominees, depending upon the outcome of the general election, who will serve from January 1, 1973 for a period of eight years in the case of one Supreme Court and one Court of Appeals seat, and six years in the case of a United States Senator, a Corporation Commissioner and every district judge in the State. Other officers would be elected for lesser terms.

Before concluding our opinion, we must decide as to the standard by which to measure or evaluate the question of the constitutionality of our primary election filing fee requirements [§ 3–8–26, subd. A, supra] in the light of our legislative history in the area of political party nominations and our experiences and successes in the

accomplishment of legislative objectives in this area under our filing fee system. Is the proper standard that of "rational relationship," or the more stringent one of "reasonable necessity," to the accomplishment of legitimate State objectives?

The question as to which of these standards was applicable to the Texas filing fee system was discussed and resolved in Bullock. Under the facts of that case, and "* * * [b]ecause the Texas filing fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, * * *" the United States Supreme Court determined that the Texas laws establishing a filing fee system in that State "* * * must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster."

In making this determination, the court stated in part:

"In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

"Unlike a filing fee requirement which most candidates could be expected to fulfill from their own resources or at least through modest contributions, the very size of the fees imposed under the Texas system gives it a patently exclusionary character. * * * Not only are voters substantially limited in their choice of candidates, but there is the obvious likelihood of this limitation falling more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required by the Texas system. * * * [W]e would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, according to their economic status."

The court in Bullock also stated in considerable detail the legitimate interests and duties which a state has in the regulation of elections as shown by the quotation above from the opinion to this effect.

In the absence of any "evidence of any kind * * * in the record from which a legitimate state objective [could] be found," the three-judge federal court sitting in Dillon held that the statutory filing fee system in New Mexico, as applied to the three plaintiffs seeking to become candidates for nomination to the office of United States Senator, was not "reasonably necessary to the accomplishment of legitimate state objectives."

The legislature of the State of New Mexico is charged with the duty of enacting laws which will secure the purity of elections and guard against the abuse of the elective franchise. Art. VII, § 1, Constitution of New Mexico. As above related, our legislature has pursued, and the electorate of this State has tried, several ways of discharging this duty in regard to the process of nominating candidates for elective offices. New Mexico has legitimate interests in avoiding overcrowded ballots, in protecting the integrity of its political processes from frivolous and fraudulent candidacies, and in relieving, or at least in reducing, the costs to the State and county treasuries of conducting primary elections. Every barrier to candidacy access to the primary ballot, which is created in the accomplishment of these legitimate interests and with the purpose of protecting the right of franchise guaranteed to all qualified voters, is not subject to that degree of scrutiny which will meet the requirement of reasonable necessity. See Bullock v. Carter, supra. Unlike the court in the Bullock case, we know the number of candidates who have sought to enter the New Mexico primary, know the overcrowding of the ballot which will result if the names of all are permitted to be placed on the primary ballots as candidates, and know that a number of those who have filed declarations of candidacy will be fraudulent or frivolous candidates if given candidacy status on the primary ballot. It is apparent to us that the nominee for

many positions will fall far short of having the support of a majority of the voters, or even a substantial plurality thereof. Instead of assuring equal protection of the franchise to New Mexico voters, the potentially overcrowded ballot would result in the protection of clearly foreseeable inequalities in the exercise of this right of franchise.

The evidence in the record before us discloses and convinces us that no serious candidate has ever been barred from the primary ballot by our filing fee system. Unlike the Texas filing fee system which was declared constitutionally invalid in Bullock, our system, as shown by the evidence adduced, makes requirements as to filing fees which any serious candidate could be expected to fulfill from his own resources, or at least through modest contributions from his supporters.

■ We cannot say that our filing fee system, or any filing fee system, or for that matter any system yet devised to protect the purity of the elective ballot and the right of franchise, falls with absolutely equal weight upon the voters. The weight of the position of every voter, in relation to what must be done by him to successfully exercise his right of franchise, cannot be absolutely equal to the weight which the position of every other voter requires must be done to accomplish the exercise of this right. We can and do say with conviction that the record in this case clearly establishes that no measurable differences between burdens, and no demonstrable differences between the chances of failure or success at the polls, are imposed upon serious candidates, and particularly upon their supporters by reason of their economic status, as a result of the filing fee requirements. We are convinced that in New Mexico at least, the economic status of a serious candidate has no substantially real relationship to the economic status of his supporters, and that matters such as political affiliation, geographic location of residence, uncommonness of name, and social, religious and other relationships and condi-

tions present far greater obstacles to political success than that of raising the required filing fee.

■ We are of the opinion that the posture of this case, as presently before us, requires only that we determine a rational relationship exists between our filing fee requirements and the legislative duty to protect the purity of elections and guard against abuses of the elective franchise in order to meet the requirements of the equal protection provisions of the Fourteenth Amendment to the Constitution of the United States and of Art. II, § 18 of the Constitution of New Mexico. Clearly a rational basis for our filing fee system is demonstrated by the record in this case.

■ However, even if the proper standard should be that applied by the court in Bullock, we would still reach the same result, because there is no doubt in our minds that the application to the forthcoming primary election of the filing fee requirements of § 3–8–26, subd. A, supra, is reasonably necessary to protect the purity of the nominating process to be accomplished in that election, to protect against the appearance on the ballots of the names of frivolous and fraudulent candidates, to assure that the nominees elected have the support of at least a substantial plurality of the voters, and to assure the voters equal protection of the law in relation to the exercise of their voting franchise.

■ Even if we were of the opinion that § 3–8–26, subd. A, supra, fails to meet the constitutional requirement of equal protection, we would not, because of the time element, apply our ruling to the forthcoming primary election, but would follow the course taken by the court in Jenness v. Little, 306 F.Supp. 925 (D.C.N.D.Ga.1969). We would make our decision apply prospectively only to primary elections to be held subsequent to the June 6, 1972 primary election, and we would do so to avoid what we believe will be certain chaos, confusion, frustration and disenfranchisement of a great number of our voters, if the ballots carry the names of all who have filed

declarations of candidacy. Our voting machinery is not geared to handle ballots of this length during the allotted time of 8:00 a.m. to 7:00 p.m. on the same day, as provided by § 3–12–1, N.M.S.A. 1953 (Repl. Vol. 1, 1970).

 Finally, a word concerning Dillon. We are not bound by that decision, if we understand it correctly. United States ex rel. Lawrence v. Woods, 432 F.2d 1072 (7th Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971). We have, however, given weight to the specific holding in Dillon by excepting Messrs. Dillon, Cole and Gailard from the purview and operation of our decision. This we are pleased to do, not only under an extension of the doctrine of comity between courts, but by reason of our warm regard and respect for our learned brethren of the three-judge panel.

It has been argued to us that the true effect of Dillon was to exempt the Senate race from the operation of § 3–8–26, subd. A, supra. From a careful reading of the Memorandum Opinion, we do not see how this could be so, although admittedly, there is language in the Memorandum Opinion to this effect. From an examination of the pleadings and the scope of the issues thereby presented, as well as the rationale of the Memorandum Opinion, it is clear that the three-judge panel reached its result predicated upon the fact that the named individuals were unable to pay the filing fee. As carefully pointed out in the Memorandum Opinion, there was no evidence adduced and it would thus have been logically impossible for the court to have determined that all others who might seek to become candidates were without funds with which to pay the required filing fees. In fact, their identities could not even then have been known.

We, on the other hand, have the advantage not only of having this information available, but also of having heard and considered lengthy testimony and other relevant evidence.

While we have readily conceded the supremacy of the United States Supreme Court on federal constitutional questions and recognize the fact that careful consideration ought to be given to decisions of inferior federal courts, we are at the same time mindful of the fact that our decisions are supreme on state constitutional questions and the objectives, purposes, true legislative intent and meaning of state statutes.

We should and do hereby affirm the validity of our decisions and commands stated in the "Order Making Alternative Writ of Mandamus Absolute" which was issued on April 17, 1972.

It is so ordered.