**Duane DRAPER and Jack Dilldine, Plaintiffs,**

v.

**Edna Mae PHELPS, individually and in the capacity as Chairman, State Election Board of Oklahoma, et al., Defendants.**

**No. CIV-72-553.**

United States District Court,
W. D. Oklahoma.

Sept. 6, 1972.

William E. Doyle, Circuit Judge, specially concurred and filed an opinion.

Eric J. Groves, V. Burns Hargis, and Robert D. McCutcheon, Oklahoma City, Okl., for plaintiffs.

Larry Derryberry, Atty. Gen., State of Okl., and Charles L. Pain and Robert H. Mitchell, Asst. Attys. Gen., Oklahoma City, Okl., for defendants.

Before DOYLE, Circuit Judge, DAUGHERTY, Chief District Judge, and EUBANKS, District Judge.

## MEMORANDUM OPINION

EUBANKS, District Judge.

This is an action for declaratory judgment and for injunctive relief brought pursuant to 28 U.S.C. §§ 2201 and 2202 to declare and to define the rights and legal relations of the parties and to secure Plaintiffs' rights, privileges and immunities under the Constitution of the United States. The action also is brought pursuant to 42 U.S.C. §§ 1981 and 1982 and 28 U.S.C. §§ 1343(3) and 1343(4). The Plaintiffs request that a specially constituted three-judge district court be convened to hear the case. A three-judge district court was constituted by David T. Lewis, Chief Judge, United States Court of Appeals, Tenth Circuit, on August 14, 1972.

This case was filed on August 14, 1972, and at the time of filing counsel for both Plaintiffs and Defendants appeared in the office of the judge to whom the case was assigned and both parties requested that the Court assume jurisdiction and immediately take proper steps to have a three-judge court convened. In order that the matter could be expedited, both sides agreed to submit the case on a stipulation of facts and both sides specifically agreed to waive arguments, and further agreed

upon a briefing schedule which has now been complied with. The matter is therefore before the Court for final disposition.

The parties have stipulated that the testimony of their respective witnesses would show as follows:

1. That the Plaintiff, Duane Draper, is an adult citizen and a registered, qualified elector of Precinct 12 of the City of Norman, Cleveland County, State of Oklahoma, which precinct is within the State House of Representatives District No. 44; that Draper filed his Notification and Declaration of Candidacy in the Office of the State Election Board of Oklahoma for the office of State Representative for District No. 44; that on July 13, 1972, Lee Cate, the incumbent office holder of District No. 44 filed, before the State Election Board, a Petition questioning and objecting to the said Notification and Declaration of Candidacy filed by Duane Draper; that in so doing Protestant Cate relied upon 14 Okl.Stat.1971, Sec. 108; that on July 20, 1972, the State Election Board, after hearing, found in favor of the Protestant Cate and against the Plaintiff Duane Draper, disqualifying the Plaintiff as a candidate and ordering that his name not be placed on the ballot for the forthcoming August 22, 1972 Democratic Primary Election, holding that the Plaintiff Draper did not comply with the durational residency requirement mandated by 14 Okl.Stat.1971, Sec. 108.

2. That Plaintiff, Jack Dilldine, is an adult citizen and a registered qualified elector of Precinct 6, Ward 4, City of Enid, Garfield County, State of Oklahoma, which precinct is within the State House of Representatives District No. 40; that Dilldine filed his Notification and Declaration of Candidacy for the office of State Representative, District 40; that the incumbent office holder of District No. 40, Tom Rogers, filed a Petition before the State Election Board challenging and objecting to the Notification and Declaration filed by Dilldine; that in so doing the Protestant Rogers relied upon 14 Okl.Stat.1971, Sec. 108;

that on July 19, 1972, after hearing, the State Election Board, relying on 14 Okl.Stat.1971, Sec. 108, held in favor of the Protestant and against Dilldine and ordered that Dilldine's name not be placed on the ballot for the forthcoming November General Election.

3. That there is no dispute that Plaintiffs Dilldine and Draper did not comply with the provisions of 14 Okl. Stat.1971, Sec. 108.

4. That the Defendants are all properly named and designated as to their particular offices and functions.

The Constitution of the State of Oklahoma, Article III, § 1, defines the qualifications of electors and provides in pertinent part as follows:

Qualified electors of this state shall be citizens of the United States, citizens of the state, including persons of Indian descent (native of the United States), who are over the age of twenty-one years and who have resided in the state at least six months, in the county two months, and in the election precinct twenty days next preceding the election at which such elector offers to vote.

The House of Representatives of the Legislature of Oklahoma is composed of 101 members elected from representative districts. 14 O.S. 112. The statutes enumerate the qualifications of candidates and provide in pertinent part as follows:

In order to file as a candidate for the House of Representatives in any of the representative districts, the candidate must have been a qualified registered elector in such district for at least six (6) months immediately preceding the filing period prescribed by law. . . 14 O.S. § 108.

Each Plaintiff herein had not been "a qualified registered elector" in the representative district for which he filed his notification and declaration of candidacy for the office of state representative for a period of "at least six (6) months preceding the filing period."

The parties have stipulated that: "There is no dispute that Plaintiffs Dilldine and Draper did not comply with the provisions of 14 O.S.1971 § 108."

The Plaintiffs contend that the statutory requirement above-quoted deprives them of the equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States. Thus the single question here is whether the above-quoted provision of 14 O.S. § 108 violates the equal protection rights of the Plaintiffs. If so, the statute is invalid; if not, the statute is valid.

In the determination of the case at bar it is recalled that there is no express constitutional provision vesting this Court with jurisdiction to adjudge the constitutionality of legislative enactments. In early cases, however, the Supreme Court held that the jurisdiction is impliedly granted by the "supremacy of the law" clause of the Constitution of the United States. Inasmuch as it is an implied grant of judicial powers, the Court approaches the exercise of that power with the greatest possible caution. This is for the further reason that statutes are enactments of co-ordinate, co-equal departments of government. Repeatedly the Supreme Court of the United States has declared that the power should be exercised only in clear cases. Other courts have held that the power should not be exercised unless the statute is so clearly violative of constitutional rights of litigants as to leave no reasonable doubt as to the invalidity of the statute. 16 Am.Jur.Const.Law §§ 101–114.

The Supreme Court of the United States rigidly adheres to the rule never to formulate a rule of constitutional law broader than that required by the precise facts to which the rule is to be applied. In Liverpool etc. Steamship Co. v. Emigration Commissioners, 1865, 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899, the Court said:

> In the exercise of that jurisdiction, it [Supreme Court] is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, *never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.* These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully. P. 39, 5 S.Ct. p. 355. [Emphasis added]

A century later, lacking five years, the foregoing language was quoted with approval of Mr. Justice Brennan in United States v. Raines, et al., 1960, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524. He prefaced the quotation with the observation that such is the rule in "This Court, as is the case with all federal courts."

The Plaintiffs rely heavily on Dunn v. Blumstein, 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274. There the Court invalidated a durational residency requirement imposed on the right to vote —not on the right of candidacy. What the Court there held and there said was solely with respect to a Tennessee statute which denied the right of suffrage to some Tennessee residents solely because of interstate movement. The rule announced is thus limited to the facts of the case. Nothing was held or said in *Dunn*, supra, respecting the imposition, as here, of a durational residency requirement on the right of one to offer himself for election to the most populous body of a state bi-cameral legislative body. Moreover, *Dunn*, supra, was decided by a divided court—seven Justices participated, of whom five joined in the opinion, one in the result and the Chief Justice dissenting.

The Plaintiffs rely also on cases involving state statutory requirements on the right to form new political parties, e. g. Williams v. Rhodes, 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24. These cases do not relate to impositions upon the right of candidacy. There also the Court did not formulate rules broader than required by the "pre-

cise facts" in issue therein. We lay aside, therefore, as not controlling here, those cases involving the validity of durational residency requirements on the exercise of rights other than that of candidacy except insofar as the cases are explanatory of the test by which the validity of 14 O.S. § 108 is to be measured under the Equal Protection of the Law clause of the Fourteenth Amendment. We lay aside also durational residency requirements, whether on the right of franchise or candidacy, imposed by federal law on federal offices. This for the reason that the Constitution of the United States imposes no equal protection of the law limitation on the Federal Government—the Fourteenth Amendment operates only on the States.

■ Large portions of the briefs are devoted to the *test* by which this Court is required to measure the validity of 14 O.S. § 108, i. e. whether the proper test is "compelling state interest" or "rationality." In Green v. McKeon, D.C.Mich. 1971, 335 F.Supp. 630, the Court was "of the opinion that it is required to apply the compelling interest standard in its resolution of this controversy," i. e. whether a city charter provision conditioning eligibility for elective or appointive office on residency in the city for two years was valid under the Equal Protection of the Law clause of the Fourteenth Amendment. p. 631. Moreover, it appears that the Supreme Court of the United States adopted the compelling interest standard in Bullock v. Carter, 1972, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 in invalidating a Texas statute which imposed filing fees of such magnitude that numerous qualified candidates were precluded from filing because the fee fell with unequal weight on candidates and voters according to their ability to pay. Prefatory to so holding the Court said:

> Because the Texas filing fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a

particular candidate, we conclude, as in *Harper*, [v. Virginia Bd. of Elections] [1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169], that the laws must be "closely scrutinized" and found reasonably necessary to the accomplishment of legitimate state objectives *in order to pass* constitutional muster. p. 144, 92 S.Ct. p. 856.

We adopt the "compelling interest" test in the case at bar. Thus we must "closely scrutinize" 14 O.S. § 108 to determine whether, to use the language of Mr. Chief Justice Burger in *Bullock*, supra, the durational residency requirement is "reasonably necessary to the accomplishment of legitimate state objectives." We observe that the word "scrutinize" means "to examine closely." It is synonymous with "inspect" and "examine." The common denominator in meaning of the three words is "to look critically and searchingly." But "scrutinize implies close observation and attention to minute detail," which are not implicit in "inspect" or "examine." Webster's 3rd New International Dictionary [unabridged].

"Close scrutiny" need not, however, disclose perfection "in order to pass constitutional muster." In Dunn v. Blumstein, supra, which was decided one month after the decision in *Bullock*, supra, and involving franchise and not candidacy requirements, Mr. Justice Marshall preliminarily observed:

> To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the character of the individual interests affected by the classification; and the governmental interests asserted in support of the classification. 405 U.S. p. 335, 92 S.Ct. p. 999.

Later in the opinion, after stating that the dictum that "durational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are *'necessary* to promote a *compelling* governmental in-

terest' " Mr. Justice Marshall further observed:

> Thus phrased, the constitutional question may sound like a mathematical formula. But legal "tests" do not have the precision of mathematical formulas. The key words emphasize *a matter of degree:* that a heavy burden of justification is on the State, and that the statute will be closely scrutinized in the light of its *asserted purposes.* [Emphasis added] pp. 342–343, 92 S.Ct. p. 1003.

What are the "asserted purposes" of the durational residency requirements on the right of candidacy? What "compelling state interests" mandate "close scrutiny" in determining validity under the Equal Protection Clause, to use the test in *Dunn,* supra? We turn first to the character of democratic government. Democratic government in the New England colonies was patterned after the direct democracy of the ancient Greek city-states. It functioned through town meetings at which every qualified inhabitant of the governmental unit had an indispensable right to discuss and to vote upon every question presented.

> This is universally understood as the vital feature of the town system of government as practiced in this commonwealth continuously from a time long before the declaration of independence until the present. [1918] This form of local government was the fibre of our institutions when the Constitution was adopted. Opinion of the Justices, Mass.1918, 229 Mass. 601, 607, 119 N.E. 778, 781.

The passage of the years saw an increase in population. New social problems evolved as the population increased. The impact of the Industrial Revolution gave rise to economic problems. Direct or pure democracy was no longer practicable even in New England. "What then is the remedy?" asked Daniel Webster in the Massachusetts Constitutional Convention of 1820. To which he replied:

> It is to authorize such organization as is adapted to the conditions of a numerous people—such an organization as will admit the inhabitants to meet . . . for the purposes of election, and choose representatives who should meet for the purpose of deliberation, instead of the whole body (of the qualified inhabitants). Journal of the Massachusetts Convention of 1820–21. [Ed.1853] p. 193. Quoted in Opinion of the Justices, supra.

The fact is irrefutable that the likelihood of harm to the state interest is greater at the candidacy level than at the voter level. The interests of the state to be served by durational residency requirements at each level are not identical. The interests are different in kind. In casting his vote at an election the voter acts for himself alone; a representative, as a member of the House of Representatives, acts, not for himself individually, but for the constituents of his district and the state. He is the spokesman for 25,339 people in his representative district. There is also a difference in the degree of interest of the state. If the voter be not sufficiently informed to cast his vote meaningfully, the voter is primarily the loser. If a representative be not qualified, if he be not conversant with the wishes of his constituents and be not informed on the problems of his district in so far as they relate to matters before the legislative assembly for consideration, the district and the state suffer—not he alone. See Buchanan v. Rhodes, D.C.Ohio, 1966, 249 F.Supp. 860, 865.

The differences in the state interest were delineated in Hadnott v. Amos, D.C. Ala.1970, 320 F.Supp. 107, affirmed without opinion, 1971, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318. There the Court held valid, against the attack under the Equal Protection of the Law, an Alabama statute which exacted a durational residency requirement of one year for candidates for the office of circuit judge. In so doing the Court said:

> The role of the candidate and of the voter differ in a democratic society, so

that the state may have a compelling interest in requiring residence for candidates that is different from its asserted interest in requiring residence for voters. Participation in the political process and freedom to move from place to place are overriding considerations in the case of the voter. His qualifications are minimal, and he need subject himself to the scrutiny of no one in the performance of his role in selection of public officers. Except in extraordinary cases the percentage of non-durational voters predictably is small. Democracy is flexible enough to stand the strain. The candidate is one of a much narrower group. . . . He must have the special capacities that will enable him to perform the office he seeks, and his possession or lack of possession of those capacities need to be exposed to those who will make the choice. Nonexposure of the narrower group—the candidates—with voters choosing from lack of knowledge, is a much more serious strain on the sinews of democracy.

The State has a compelling interest in preventing frivolous and fraudulent candidacy by persons who have had no previous exposure to the problems and desires of the electorate of a representative district. The Court knows of its own knowledge that this problem has existed for many years. Absent a durational residency requirement "carpet bagger" candidates who have no desire, as agents or representatives of the district, genuinely to acquaint themselves with the problems of a representative district and conscientiously strive for the solution thereof in the legislative halls, can be candidates.

The State also has a compelling interest in requiring that those who expect to stand for the office of state representative take the matter seriously and make plans for their candidacy in advance of the election date. Serious candidates do usually have well-laid plans fashioned over a period of time. The great majority of state representatives have lived in their respective districts for periods well in excess of the six months required by 14 O.S. § 108.

The Legislature, of which the House of Representatives is an integral part and to which the Plaintiffs covet election, is the policy determining, the law making, branch of our State government. If those who serve there as elected representatives are to be effective agents of their constituents, if representative government is to function as it should at the highest and best level, assuredly the voters in each representative district should be afforded an opportunity to appraise the qualifications of the candidates in order that they elect those whom they deem to be best qualified. Historically that opportunity has been afforded by residence for a period of time in the representative district in which a candidate chooses to stand for election.

There are innumerable qualities and qualifications of the candidate that are relevant on which the voters are entitled to be informed in order to cast their votes meaningfully. There are personal qualifications. Is the candidate a person of honesty and integrity? What does he know about the law making process? Is such knowledge based on booklearning or experience? Has he served an apprenticeship in a less important deliberative body, e. g. City Council or School Board? Is he too immature or too old to be effectual? Is he qualified by temperament, training and experience to act as the representative of others in the making of laws? Is he an individual of balanced judgment? Is he tolerant of the views of others? Is he respectful and courteous? Has he the desire, capacity and patience, if elected, to compromise differences with fellow legislators in legislative committees in determining policies, the enactment of state laws and the appropriation of public funds? The foregoing qualities can best be judged in personal contacts of the candidates with the voters.

The business and financial affairs of the candidate also are matters on which

the voters are entitled to be informed. What motivates a candidate? Has the candidate succeeded or failed in the operation of a business or in practice of a profession? What property does he own? Will his ownership, or lack of ownership, of property affect his decisions as a member of the House of Representatives in the formulation of governmental policies or the appropriation of public funds? If he is engaged in business, is it one in the regulation or taxation of which he will participate as a representative? "All bills for raising revenue" must originate in the House of Representatives. Article 5, Constitution of Oklahoma, Section 33. Do his business or professional interests, or those of his supporters, so tie him to others that there is a risk of favoritism in legislative treatment? These are factors which touch qualifications of a candidate.

The foregoing are matters which require the lapse of a period of time during which the voters may inform themselves. As the Court, in Hadnott v. Amos, supra, said:

> The catalog could be endless. The democratic process [representative government] contemplates that the voters shall make a choice. . . the state has a compelling interest in attempting to see that the voters have the opportunity that their choice be an informed one. Assertion of the state interest will bring imperfect results. Less than all voters will observe, learn and rationally choose, but this is not to deny to the state its interest in extending the opportunity. 320 F.Supp. p. 121.

The particular significance of exposure of candidates by residence is demonstrated in this case. The State was formed by the union of the Indian Territory, the home of five civilized tribes, and the Oklahoma Territory, the home of the plains Indians. The non-Indian population, upon the opening of the territories to the settlement by the whites, came from different states and with different backgrounds. Those who emigrated to the northern section of the State came largely from the states to the North. Those who emigrated to the southern portion of the Indian Territory came largely from Texas and Arkansas. Large numbers in the north came from the Eastern states. The ethnical backgrounds are different and there are wide variances between northern and southern sections in party allegiance of the voters.

The members of the House of Representatives are elected from 101 representative districts embracing 77 counties. Some districts are poverty stricken while other areas are affluent. Some districts are criss-crossed with improved roads while road improvements lag in others. In some the predominant industry is agriculture while in others it is ranching. In still others it is mining, lumbering or manufacturing. Some districts are populated predominantly by white voters. Some districts have high quality schools while others do not. Urban districts face problems of air pollution. The oil-producing districts face problems of the pollution of their fresh water-bearing strata by the oil extraction industry. Still others face pollution of their rivers.

The State House of Representatives Apportionment Act of 1971 fixed the number of representative districts at 101. The formula and procedure for apportionment of the House of Representatives under the Act was derived by dividing 101 Representative Districts into the total population of the State according to the 1970 Federal Decennial Census. Under that division the "ideal" representative district contained a population of 25,339 persons. Under that division the mathematical variances made by the Act of 1971 are small. The range of variance is 2.2% from high to low.

In distributing the population of the State among 101 representative districts, to meet the constitutional requirement of "one man one vote", the State House of Representatives Apportionment Act of 1971 ignored many factors which had been given measurable consid-

eration in earlier apportionment acts, i. e. compactness, political units, and contiguousness. The large majority of the 77 counties, for example, are rural ones. Nine counties [Cimmaron, Coal, Dewey, Ellis, Harmon, Harper, Haskell, Love and Roger Mills] have populations of less than 6,000. Each of 21 counties has a population of less than 10,000, while 21 others have populations ranging from 10,001 to 20,000. The populations of such counties being insufficient necessarily required that counties be combined to form representative districts to achieve the ideal of 25,339 persons. District 57 embraces all of Harper, Ellis and Dewey counties and segments of Beaver and Custer counties. District 20 embraces all of Coal and Atoka Counties and a large segment of Pittsburgh County. District 15 embraces all of McIntosh and segments of Okmulgee and Haskell counties. Counties with populations in excess of 25,339 persons had to be divided. In summary, 53 counties had populations less than the 25,339 "ideal number" required for a representative district. Twenty-two counties with more than the "ideal number" of 25,339 had excess populations which had to be joined with segments of other counties in fashioning representative districts.

There is a paucity of television and radio stations and a lack of daily newspapers in a large number of the rural representative districts. The exposure of candidates to voters in these representative districts must necessarily be personal and personalized. As the Court said in Hadnott v. Amos, supra:

Necessarily communication between candidate and voter is personal and personalized. Information which under other circumstances might be communicated by more formal means necessarily is communicated informally by personal acquaintance and observation, by word of mouth from neighbor to neighbor. The voters acquire general community knowledge about the candidate, while at the same time the candidate builds a community reputa-

tion concerning many of the traits to which we above referred. These are processes which cannot operate overnight. But they represent appropriate functioning of democracy. 320 F. Supp. p. 121.

The Court concludes that a six-months residence requirement in the representative district in which a candidate seeks election to the House of Representatives of Oklahoma is not violative of the Equal Protection of the Law clause of the Fourteenth Amendment of the Constitution of the United States.

In reaching the foregoing conclusion the holdings of other courts have been helpful. In State ex rel. Apodaca v. Fiorina, 1972, 83 N.M. 663, 495 P.2d 1379, the Supreme Court of New Mexico sustained the validity of a filing fee of six percent of the first year's salary as a requirement of candidacy. In State of Missouri ex rel. Gralike v. Walsh, Mo., 483 S.W.2d 70 decided July 14, 1972, the Supreme Court of Missouri sustained the validity of a statute which requires that a state senator be a resident of the district, which he is chosen to represent, for a period of not less than one year.

There are cases in which courts have held that no compelling state interest validated durational residency requirements which were different in length of time or respecting an office in local government. In Mogk v. City of Detroit, Mich.1971, 335 F.Supp. 698, a three-judge court held invalid, as violative of equal protection of the law, a three-year residency requirement for membership on the City of Detroit revision charter commission—a residency period six times in length of that required by 14 O.S. § 108 and respecting a local office as distinguished from a state office in the case at bar. Green v. McKeon, supra, invalidated a charter provision of the City of Plymouth, Michigan, establishing a two-year residency period as a requisite for elective or appointive offices in the city—a residency period four times in length to that required by 14 O.S. § 108 and again respecting a local as distinguished from a state office.

In McKinney v. Kamisky, D.C.Ala.1972, 340 F.Supp. 289, the Court held invalid a five-year residency requirement for the office of county commissioner—a residency requirement period ten times in length to that required by 14 O.S. § 108 and again respecting a local office as distinguished from a state office. Counsel have not directed the Court's attention to any reported case in which a candidacy residency requirement of six months for those who covet election to a state office has been held violative of the Equal Protection of the Law clause of the Fourteenth Amendment of the Constitution of the United States. The exhaustive research of the Court likewise has produced none.

For the reasons above-stated the Court finds that 14 O.S. § 108 which requires that "in order to file as a candidate for the House of Representatives in any of the representative districts, the candidate must have been a qualified registered elector in such district for at least six (6) months immediately preceding the filing period prescribed by law" is a valid statutory enactment of the Legislature of Oklahoma and complies fully with the Equal Protection of the Law clause of the Fourteenth Amendment of the Constitution of the United States.

Accordingly, the relief sought by Plaintiffs herein is in all things denied.

Counsel for Defendants will prepare an appropriate Judgment.

WILLIAM E. DOYLE, Circuit Judge (specially concurring).

I concur generally in Judge Eubanks' very thorough opinion, and the views I express here are not intended to undermine any of the expressions contained in his thorough and straightforward opinion. Since, however, the plaintiffs are relying almost entirely on Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), I would add a few comments on this decision.

In the Dunn opinion it is stated that the right to travel is an absolute right.

However, because of the nature of the present regulation, the relationship between it and the right to travel is indirect and remote. I do not think that the right to public office can be equated to the right to vote in relationship to the right to travel. Candidacy for public office is quite different from voting, and one does not travel from one place to another contemplating that he will offer himself to the voters for election to state office. Therefore, I do not think that the expression in Dunn v. Blumstein, *supra*, is applicable to the statute in the case at bar.

As to the violation of the equal protection clause, I agree that the applicable standard is that of compelling state interest, and such an interest is here apparent. Furthermore, the length of the residence duration is not unreasonable in relation to the objects of the statute.

It is not necessary to express ourselves as to what, if any, periods other than six months prior to filing are to be regarded as reasonable or unreasonable. It is enough to hold that the period in question applied to these facts is reasonably related to the interests which Oklahoma seeks to advance.