318 S.E.2d 470

**Barbara K. WHITE and Brenda Joe**

v.

**A. James MANCHIN, Secretary of State; Joe Manchin, III; Jean Friend, Robert W. Dinsmore, and Jacques R. Williams, Ballot Commissioners of Monongalia County; and, Betty W. Toothman, Harry Cronin, and Hayes Webb, Ballot Commissioners of Marion County.**

**Vaughnie HALL, Ireland Burns, and Mary Helmann**

v.

**A. James MANCHIN, Secretary of State; Charles M. Polan, Jr.; Riley Stone, W.H. Hertig, and James N. Aldridge, Ballot Commissioners of Cabell County; and Charlene Ferguson, Audrey Mudd, and Luther Wallace, Ballot Commissioners of Wayne County.**

Nos. 16312, 16344.

Supreme Court of Appeals of West Virginia.

July 13, 1984.

R.F. Gallagher and William F. Byrne, Morgantown, for petitioners in No. 16312.

A.J. Manchin, pro se.

John M. Pratt, Deputy Secretary of State, Charleston, for respondent A. James Manchin in No. 16312.

John Carrico, S.J. Angetti, Rudolph Di Trapano and Franklin D. Cleckley, Morgantown, for respondent Joe Manchin, III, in No. 16312.

Thomas H. Newbraugh, Pros. Atty. and Phillip M. Magro, Asst. Pros. Atty., Morgantown, for respondents Jean Friend, Robert W. Dinsmore and Jacques R. Williams in No. 16312.

Larry Harless, Morgantown, for petitioner in No. 16344.

Marianne K. Hoover, Asst. Atty. Gen., Charleston, for respondent A. James Manchin in No. 16344.

David C. Hardesty, Jr., Deborah A. Sink and Thomas A. Heywood, Charleston, for respondent Charles M. Polan, Jr., in No. 16344.

McGRAW, Justice:

These two original proceedings in mandamus, consolidated for preparation of this opinion, involve challenges to the qualifications of two candidates for nomination to the office of state senator. Each requires interpretation of West Virginia Constitution art. VI, § 12, which provides, in pertinent part, that "No person shall be a senator ... who has not for one year next preceding his election, been a resident of the district or county from which he is elected ...." There are primarily three issues involved in the interpretation of this constitutional durational residency requirement. First, whether mandamus is appropriate to enforce the provisions of West Virginia Constitution art. VI, § 12. Second, whether the respondent candidates are residents of the senatorial district and the county they respectively seek to represent. Finally, whether the respondent candidates will have been residents of the senatorial district and the county they respectively seek to represent for one year prior to the November general election.

In the first mandamus action, the petitioners are residents of and registered voters in the 14th Senatorial District, which is composed of parts of Marion and Monongalia Counties. *See* West Virginia Code § 1–2–1(d)(14) (1983 Supp.). Respondent A. James Manchin is Secretary of State and "chief election official of the State." *See* West Virginia Code § 3–1A–6 (1979 Replacement Vol.). Respondent Joe Manchin III [hereinafter "candidate Manchin"] is currently Delegate to the West Virginia Legislature from the 31st Delegate District and has filed a certificate declaring himself a candidate for nomination on the Democratic Party ticket to the office of state senator from the 14th Senatorial District. Respondents Jean Friend, Robert W. Dinsmore, and Jacques R. Williams are the Ballot Commissioners of Monongalia County. Respondents Betty W. Toothman, Harry Cronin, and Hayes Webb are the Ballot Commissioners of Marion County.

In the second mandamus action, the petitioners are residents of and registered voters in the 5th Senatorial District, which is

composed of parts of Cabell and Wayne Counties. *See* West Virginia Code § 1-1-2(d)(5) (1983 Supp.). Respondent Charles M. Polan, Jr. [hereinafter "candidate Polan"] is currently Delegate to the West Virginia Legislature from the 13th Delegate District and has filed a certificate declaring himself a candidate for nomination on the Democratic Party ticket to the office of state senator from the 5th Senatorial District. Respondents Riley Stone, W.H. Hertig, and James N. Aldridge are the Ballot Commissioners of Cabell County. Respondents Charlene Ferguson, Audrey Mudd, and Luther Wallace are the Ballot Commissioners of Wayne County. Respondent A. James Manchin is also party to this mandamus action.

The petitioners in these mandamus actions seek to compel the respondent Secretary of State to withdraw certification of the respondent candidates' candidacies and to compel the respondent ballot commissioners to omit or strike the names of the respondent candidates from the official Democratic Party primary election ballot to be used on June 5, 1984.[1]

In the mandamus action against candidate Manchin, the petitioners contend that he is not a resident of the 14th Senatorial District and that he is therefore ineligible to be elected to or to hold the office of state senator from that district under West Virginia Constitution art. VI, § 12. They further contend that candidate Manchin will not have been a resident of the 14th Senatorial District for one year prior to the November general election and that he is therefore also ineligible under the one year durational residency requirement of that same constitutional provision. Both of these assertions are supported by affidavits and other evidence submitted by the petitioners.[2]

In the mandamus action against candidate Polan, another constitutional provision in addition to West Virginia Constitution art. VI, § 12 is involved. West Virginia Constitution art. VI, § 4 provides that "Every district shall elect two senators, but, where the district is composed of more than one county, both shall not be chosen from the same county." Because the other state senate seat in the 5th Senatorial District is currently held by the Honorable Robert Nelson, whose present term will expire in 1986, and who resides in Cabell County, the state constitution requires that

---

1. Due to the imminency of the primary election, as well as the clarity of the petitioners' right to the relief sought, this Court issued orders on May 25, 1984, and May 29, 1984, granting the petitioners in each case the relief requested. We noted in each of these orders our intention to more fully develop the issues involved in an opinion to follow. This was done in accordance with our past practice where time constraints precluded preparation of a full opinion. *See State ex rel. Manchin v. Lively,* 170 W.Va. 672, 295 S.E.2d 912, 913 n. 1 (1982); *West Virginia Libertarian Party v. Manchin,* 165 W.Va. 206, 270 S.E.2d 634, 637 (1980); *see also State ex rel. Bromelow v. Daniel,* 163 W.Va. 532, 533 n. 1, 258 S.E.2d 119, 120 n. 1 (1979); *State ex rel. Brewer v. Wilson,* 151 W.Va. 113, 115, 150 S.E.2d 592, 594 (1966), *overruled on other grounds Marra v. Zink,* 163 W.Va. 400, 408, 256 S.E.2d 581, 586 (1979); *State ex rel. Cline v. Hatfield,* 145 W.Va. 611, 612, 116 S.E.2d 703, 704 (1960); *State ex rel. Duke v. O'Brien,* 145 W.Va. 600, 602, 117 S.E.2d 353, 354 (1960).

2. A total of five affidavits were submitted in support of the assertions that candidate Manchin is not a resident of the 14th Senatorial District and that he will not have been a resident for one year prior to the November general election. Two affidavits, submitted by candidate Manchin's neighbors, indicate that candidate Manchin, along with his wife and children, currently resides in a house located on Colfax Road in an area of Marion County known as Whitehall, which is situated in the 13th Senatorial District. One affidavit, submitted by the teacher of one of candidate Manchin's children, indicates that the child resides with her family at this house on Colfax Road. A fourth affidavit, submitted by a person who visited a house apparently owned by candidate Manchin in Farmington, which is located in the 14th Senatorial District, states that candidate Manchin's aunt, and not candidate Manchin, resides in this house. Finally, in an affidavit submitted by a person who searched the public records of Marion County, various indicia of candidate Manchin's nonresidency in the 14th Senatorial District are noted, including the fact that the only personal telephone listing for candidate Manchin is under his Colfax Road address. In addition to these five affidavits, the petitioners verify the accuracy of factual statements contained within their petition for a writ of mandamus which indicate that candidate Manchin does not reside in the 14th Senatorial District, but rather in the house located on Colfax Road in the 13th Senatorial District.

the state senator to be elected this year to represent the 5th Senatorial District reside in Wayne County. The petitioners contend that candidate Polan is not a resident of Wayne County and that he is therefore ineligible to be elected to or hold the office of state senator from that district. In addition, the petitioners contend that candidate Polan will not have been a resident of Wayne County for one year prior to the November general election. Both of these assertions are supported by affidavits and other evidence submitted by the petitioners.[3]

## I.

█ In Syllabus Point 5 of *State ex rel. Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607, *appeal dismissed sub nom. Moore v. McCartney*, 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976), this Court stated:

> In West Virginia a special form of mandamus exists to test the eligibility to office of a candidate in either a primary or general election. The proper party respondent in such special action in mandamus is the Secretary of State of the State of West Virginia in the case of an office to be filled by the voters of more than one county or the clerk of the circuit court in the case of an office to be filled by the voters of one county, and this action in mandamus, being a special creation of the evolving common law, is ripe for prosecution immediately upon a candidate's filing of his certificate of candidacy.

*See also* Syl. pt. 1, *State ex rel. Alsop v. McCartney*, 159 W.Va. 829, 228 S.E.2d 278 (1976).

█ This special form of mandamus is found in West Virginia Code § 3-1-45 (1979 Replacement Vol.), which provides that, "Any officer or person, upon whom any duty is devolved by [Chapter Three of the Code], may be compelled to perform the same by writ of mandamus." This statute further provides that, "A mandamus shall lie from the supreme court of appeals ... to compel *any* official herein to do and perform legally any duty herein required of him." [Emphasis added]. Therefore, not only is the Secretary of State a proper party respondent, but the respondent ballot commissioners are also proper party respondents. In this regard, this Court held in Syllabus Point 1 of *State ex rel. Summerfield v. Maxwell*, 148 W.Va. 535, 135 S.E.2d 741 (1964):

> The eligibility of a candidate for an elective office may be determined in a proceeding in mandamus and, upon a determination therein that a candidate is ineligible to be elected to or to hold the office for which he seeks nomination or election, a writ of mandamus will issue directing the board of ballot commissioners to strike or omit such candidate's name from the primary or general election ballot.

*See also State ex rel. Rushford v. Meador*, 165 W.Va. 48, 267 S.E.2d 169, 170 n. 1 (1980); Syl. pt. 1, *Benson v. Robertson*, 159 W.Va. 674, 226 S.E.2d 447 (1976); Syl. pt. 1, *State ex rel. Dostert v. Riggleman*, 155 W.Va. 808, 187 S.E.2d 591 (1972); *State ex rel. Gengo v. Cudden*, 153 W.Va. 190, 197, 168 S.E.2d 541, 545 (1969).

█ In Syllabus Point 6 of *State ex rel. Maloney v. McCartney, supra*, this Court also made clear that it is proper to name

---

**3.** A total of three affidavits were submitted in support of the assertions that candidate Polan is not a resident of Wayne County and that he will not have been a resident for one year prior to the November general election. All three affidavits, submitted by individuals residing near an office/industrial building located at 909 Camden Road in the Wayne County portion of the 5th Senatorial District which candidate Polan seeks to represent, state that the affiants have not observed the candidate residing at this address. Additionally, a deputy with the Wayne County Tax Department states that Wayne County tax records indicate no real or personal property charged to candidate Polan. A copy of a page from the Huntington telephone directory also indicates that, as of January 1984, the only personal telephone listing for candidate Polan is at The Prichard Building in Cabell County. Finally, the petitioners verify the accuracy of the factual statements contained within the petition for a writ of mandamus which indicate that candidate Polan does not reside in Wayne County, but rather in an apartment located in The Prichard Building in Cabell County.

the individual candidate, the real party in interest, as a party respondent in an election mandamus action, stating:

Where an action in mandamus is brought to test eligibility to office before a primary or general election it is proper to join as an original party respondent the real party in interest in order to avoid the delay attendant upon petitions to intervene and other procedural formalities which might frustrate the expeditious resolution of the case.

■ In relationship to the petitioners' standing to bring these election mandamus actions, this Court held in Syllabus Point 1 of *State ex rel. Pack v. Karnes,* 83 W.Va. 14, 97 S.E. 302 (1918), *overruled on other grounds,* Syl. pt. 12, *State ex rel. Booth v. Board of Ballot Comm'rs,* 156 W.Va. 657, 196 S.E.2d 299 (1973), that "A citizen, tax payer or voter has such interest as entitles him to maintain mandamus to compel a board of ballot commissioners to discharge their duties lawfully ...." *See also* Syl. pt. 2, *State ex rel. Zickefoose v. West,* 145 W.Va. 498, 116 S.E.2d 398 (1960), *overruled on other grounds,* Syl. pt. 12, *State ex rel. Booth v. Board of Ballot Comm'rs, supra; State ex rel. Alsop v. McCartney,* 159 W.Va. at 838 n. 7, 228 S.E.2d at 283 n. 7; Syl. pt. 7, *State ex rel. Baker v. Bailey,* 152 W.Va. 400, 163 S.E.2d 873 (1968). The same principle applies when the Secretary of State is also named a party respondent. The respondent candidates do not challenge the standing of the petitioners to bring these election mandamus actions.

As previously noted, election mandamus is a special creation of the Legislature involving fundamental interests not ordinarily found in other types of mandamus actions. For example, in *State ex rel. Maloney v. McCartney,* 159 W.Va. at 526–27, 223 S.E.2d at 616, this Court stated:

A consistent line of decisions of this Court during the last fifteen years clearly recognizes that the intelligent and meaningful exercise of the franchise requires some method of averting a void or voidable election. Consequently this Court has recognized that some form of proceeding must be available by which

interested parties may challenge in advance of a primary or general election the eligibility of questionable candidates in order to assure that elections will not become a mockery.

*See also Marra v. Zink,* 163 W.Va. 400, 402, 256 S.E.2d 581, 583 (1979).

■ This Court has also recognized that the unique interests implicated in election mandamus actions require a unique approach to their disposition. For example, in Syllabus Point 2 of *State ex rel. Bromelow v. Daniel,* 163 W.Va. 532, 258 S.E.2d 119 (1979), this Court stated, "Because there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural vigor as an ordinary mandamus case." *See also State ex rel. Manchin v. Lively,* 170 W.Va. 672, 295 S.E.2d 912, 913 n. 2 (1982). Similarly, in *State ex rel. Daugherty v. County Court,* 127 W.Va. 35, 45, 31 S.E.2d 321, 326 (1944), this Court stated, "The writ of mandamus as authorized in election cases in this state greatly broadens and liberalizes the common law right, as to both its scope and the procedure therein." *See also State ex rel. Maloney v. McCartney,* 159 W.Va. at 528, 223 S.E.2d at 616; *State ex rel. Booth v. Board of Ballot Comm'rs,* 156 W.Va. at 669, 196 S.E.2d at 305; *State ex rel. Zickefoose v. West,* 145 W.Va. at 510, 116 S.E.2d at 405; *Duncan v. County Court,* 138 W.Va. 106, 110, 75 S.E.2d 97, 100 (1953); *State ex rel. Bumgardner v. Mills,* 132 W.Va. 580, 588, 53 S.E.2d 416, 424 (1949); *State ex rel. Fanning v. County Court,* 129 W.Va. 584, 587, 41 S.E.2d 855, 857 (1946); *State ex rel. Lawhead v. County Court,* 129 W.Va. 167, 170, 38 S.E.2d 897, 899 (1946); *Marquis v. Thompson,* 109 W.Va. 504, 508, 155 S.E. 462, 464 (1930); *Sanders v. Board of Canvassers,* 79 W.Va. 303, 308, 90 S.E. 865, 867 (1916); *Stanton v. Wolmesdorff,* 55 W.Va. 601, 602, 47 S.E. 245, 246 (1904); *Daniel v. Simms,* 49 W.Va. 554, 575, 39 S.E. 690, 698 (1901); *Dunlevy v. County Court,* 47 W.Va. 513, 518–19, 35 S.E. 956, 958 (1900); *Hebb v. Cayton,* 45 W.Va. 578, 580, 32 S.E. 187, 188 (1898); Syl. pt. 4, *Marcum v.*

*Ballot Comm'rs,* 42 W.Va. 263, 26 S.E. 281 (1896). With this perspective on the nature of election mandamus, we now address the candidates' contentions as to the appropriateness of mandamus in these cases.

The respondent candidates advance three objections to the utilization of election mandamus in these cases.[4] First, they contend that mandamus should have first been sought in circuit court. Second, they assert that the availability of post-primary relief provides an adequate alternative remedy. Finally, they maintain that these actions are barred by the equitable doctrine of laches.

■ As previously noted, we do not require the same degree of procedural vigor in election mandamus proceedings as in other mandamus actions. *See* Syl. pt. 2, *State ex rel. Bromelow v. Daniel, supra.* For example, in *Bromelow,* we held that a candidate was not foreclosed from filing a mandamus action in this Court even though he could have appealed from the denial of his similar petition for writ of mandamus in circuit court. 163 W.Va. at 537, 258 S.E.2d at 122. In the present actions, to require the petitioners to seek relief in circuit court would require the maintenance of four actions rather than two since each senatorial district involved is comprised of two counties with two sets of ballot commissioners. Obviously, this would raise the potential for conflicting judgments, which would then require the resolution of any inconsistencies by this Court. West Virginia Code § 3-1-45 (1979 Replacement Vol.) provides for concurrent jurisdiction in election mandamus cases. Given that "the principle purpose of the liberalized election mandamus is to provide an expeditious pre-election hearing to resolve the eligibility of candidates, so that the voters can exercise their fundamental franchise as to all eligible candidates," *State ex rel. Bromelow v. Daniel,* 163 W.Va. at 536, 258 S.E.2d at

122, we conclude that under the circumstances of these cases, the petitioners were not required to first seek relief in circuit court.

■ The respondent candidates also assert that the post-primary election contest mechanism under West Virginia Code § 3-7-4 (1979 Replacement Vol.) provides an adequate alternative remedy to the petitioners, and that, therefore, they are precluded from seeking the current relief. This Court rejected such a contention in *Adams v. Londeree,* 139 W.Va. 748, 753, 83 S.E.2d 127, 131 (1954), *overruled on other grounds,* Syl. pt. 12, *State ex rel. Booth v. Board of Ballot Comm'rs, supra,* stating:

> It is true ... that in some instances the qualification of a candidate may be determined in an election contest proceeding.... To say that it is the only available and adequate remedy, however, obviously would deny courts having original jurisdiction of such proceedings as mandamus, *quo warranto* or prohibition, any jurisdiction as to questions concerning qualifications of candidates for nomination or election to office. The cases cited are sufficient authority to the contrary.

Additionally, as previously noted, it is important that voters not be denied the full exercise of their franchise by fraudulent candidacies. *See State ex rel. Maloney v. McCartney,* 159 W.Va. at 526–27, 223 S.E.2d at 616.

Finally, the respondent candidates maintain that mandamus is barred in these actions by the doctrine of laches. In holding that a delay of fifty-three days in filing a petition for a writ of mandamus did not bar a candidate's challenge to the counting of allegedly illegal ballots, this Court stated in *State ex rel. Daugherty v. County Court,* 127 W.Va. at 49, 31 S.E.2d at 328, that:

> Code, 3-5-41, authorizes this Court to coerce performance of their duties by

---

**4.** The respondent candidates raise several other issues concerning the appropriateness of mandamus in these cases which warrant only brief mention. They contend that the cases require a more detailed factual development and that the evidence submitted by the petitioners is insufficient to support the assertions of nonresidency.

They contend that they have been denied an adequate opportunity to complete meaningful discovery. Finally, they contend that the failure to afford them a full blown evidentiary hearing on the issue of their residency constitutes a denial of due process. We find no merit in any of these contentions.

election officials without fixing any time within which such remedy must be invoked. The provisions of this section of the Code clearly indicate a legislative policy that election controversies should be brought into this Court and ended with all reasonable speed. But what constitutes undue delay depends upon the circumstances of each case.

■ As the respondent candidates correctly note, this Court held in Syllabus Point 3 of *State ex rel. Waller Chemicals, Inc. v. McNutt*, 152 W.Va. 186, 160 S.E.2d 170 (1968), "The writ of mandamus will be refused when the petitioner has unreasonably delayed his application for such writ and by reason of the delay the rights of the defendant or innocent third parties will be prejudiced by the issuance of the writ." *See also State ex rel. Musick v. Londeree*, 145 W.Va. 369, 371–72, 115 S.E.2d 96, 98 (1960); Syl. pt. 1, *State ex rel. Kay v. Steinmetz*, 144 W.Va. 802, 111 S.E.2d 27 (1959); Syl. pt. 2, *Cunningham v. City of Huntington*, 97 W.Va. 672, 125 S.E. 810 (1924); Syl. pt. 6, *Rhodes v. Board of Education*, 95 W.Va. 57, 120 S.E. 183 (1923). However, this Court also stated in Syllabus Point 6 of *Herzog v. Fox*, 141 W.Va. 849, 93 S.E.2d 239 (1956):

> Though relief by mandamus may be refused when the petitioner has been guilty of unreasonable delay and the rights of the defendant or of innocent third parties will be prejudiced by the issuance of the writ, the circumstances surrounding the delay, the character of the case, the situation of the parties, the nature of the relief sought, and whether the rights of third parties have been innocently acquired, should be considered in determining whether the delay is unreasonable and justifies application of the equitable doctrine of laches; and what constitutes laches depends upon the facts and the circumstances of each particular case.

■ As previously mentioned, an election mandamus action challenging the eligibility of a candidate for nomination or election "is ripe for prosecution immediately upon a candidate's filing of his certificate of candidacy." *See* Syl. pt. 5, *State ex rel.*

*Maloney v. McCartney, supra.* Although the exact filing dates of the respondent candidates do not appear in the record, we note that under West Virginia Code § 3-5-7 (1979 Replacement Vol.), certificates of candidacy "shall be filed ... not later than the last Saturday of March next preceding the primary election day ...." Potentially, those wishing to challenge candidate eligibility have only nine weeks within which to initiate appropriate proceedings. In the present actions, the petitioners filed their respective petitions over two weeks prior to the June 5th primary. The overwhelming trend in our election mandamus cases has been to permit such actions as a method of averting void or voidable elections "in order to assure that elections will not become a mockery." *State ex rel. Maloney*, 159 W.Va. at 527, 223 S.E.2d at 616. It would indeed be a mockery of both our electoral process and justice if we were to hold that a delay of less than seven weeks precluded a challenge to the eligibility of a candidate for nomination to public office. Any inconvenience suffered by the respondent candidates or third parties as a result of the delay in these cases is far outweighed by the inconvenience suffered by the public should those candidates prove ineligible to hold the offices sought in mandamus actions brought following completion of the primary election.

## II.

The second major issue raised in these mandamus actions is whether the respondent candidates are residents of the senatorial district and the county they respectively seek to represent under West Virginia Constitution art. VI, § 12, which provides that "No person shall be a senator ... who has not for one year next preceding his election, been a resident of the district or county from which he is elected." Prior to our discussion of the meaning of the term "resident" within the context of this constitutional provision, we will first address the respective candidates' varying interpretations of the phrase "district or county."

Emphasizing the inclusion of the word "county," candidate Manchin, who alleg-

edly resides in the 13th Senatorial District section of Marion County, contends that senators need not actually reside in the senatorial district they represent, as long as they reside in a county of which a section is contained within that senatorial district. On the other hand, emphasizing the inclusion of the word "district," Candidate Polan, who allegedly resides in Cabell County, contends that senators need not actually reside in the county they represent under West Virginia Constitution art. VI, § 4, as long as they reside in the senatorial district. We reject both interpretations.

In *Howard v. Ferguson,* 116 W.Va. 362, 367, 180 S.E. 529, 531 (1935), this Court held that "[c]onstitutional provisions *in pari materia* must ... be read together." *See also* Syl. pt. 4, *State ex rel. Kanawha County Building Comm'n v. Paterno,* 160 W.Va. 195, 233 S.E.2d 332 (1977); *State ex rel. Kidd v. Bailey,* 152 W.Va. 196, 201, 160 S.E.2d 142, 145 (1968); Syl. pt. 1, *Diamond v. Parkersburg-Aetna Corp.,* 146 W.Va. 543, 122 S.E.2d 436 (1961); *Charleston Transit Co. v. Condry,* 140 W.Va. 651, 658, 86 S.E.2d 391, 396 (1955); *State ex rel. Thompson v. Morton,* 140 W.Va. 207, 218, 84 S.E.2d 791, 797–98 (1954); Syl. pt. 3, *Berry v. Fox,* 114 W.Va. 513, 172 S.E. 896 (1934), *overruled on other grounds, Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 871 n. 25 (1979); Syl. pt. 3, *State v. Harden,* 62 W.Va. 313, 58 S.E. 715, 60 S.E. 394 (1907); Syl. pt. 2, *State v. Kyle,* 8 W.Va. 711 (1875).

■ Reading West Virginia Constitution art. VI, § 12, which provides that "No person shall be a senator ... who has not for one year next preceding his election, been a resident of the district or county from which he is elected," in pari materia with West Virginia Constitution art. VI, § 4, which provides that "where the [senatorial] district is composed of more than one county, both [senators] shall not be chosen from the same county," it is plain and unambiguous that senators representing senatorial districts composed of more than one county must be residents of both the county and the district from which they are elected. The key language in West Virginia Constitution art. VI, § 12 is "from which he is elected." The key language in West Virginia Constitution art. VI, § 4 is "from the same county." Senators representing single county senatorial districts are elected "from" the district. Senators representing multi-county senatorial districts are elected "from" one of the counties within the district. If state senators were not required to reside in the senatorial district they represent as long as they reside in a county of which a section is contained within that senatorial district, the lines dividing particular counties into different senatorial districts would be rendered meaningless. Similarly, if state senators were not required to reside in the county they represent as long as they resided in the senatorial district, West Virginia Constitution art. VI, § 4 would be rendered meaningless.

The above construction of West Virginia Constitution art. VI, §§ 4 and 12 is supported by the constitutional debates surrounding the adoption of predecessor provisions. Much of the debate as to both provisions centered on ensuring adequate representation for all portions of the state. For example, in expressing concern over the creation of multi-county senatorial districts, Delegate James H. Brown of Kanawha County stated:

You find large portions of our section of the State have received no advantages. We find this section of the State that has the population—the small section containing the political power of the State— with railroads running through it. They did not come out of the state treasury, I admit, but they got it, and by reason of the railroads these counties have grown rich and populous. Now they have got the whole power of the State in their hands and the proposal is to keep it there. Now, here are other counties that need some aid; and the question is, will you adopt a system that will attach those counties to each of the larger counties and put them in their control? I oppose; I vote not. I do not represent a small county but I feel a great interest in the whole section of the country I represent and represent the feeling and interest

and sympathy that pervades the whole section of the country—far stronger than the small trifle of obtaining one delegate more in my county. Because we have a common interest. I know that these small counties, as well as many others, will have wants at the hands of the public that they must receive or be shut out forever, and that their growth in any great degree is to depend on the legislation of the State.

2 DEBATES AND PROCEEDINGS OF THE FIRST CONSTITUTIONAL CONVENTION OF WEST VIRGINIA 168 (1861–1863). Similarly, in support of the proposed provision limiting a county to a single senator, Delegate E.B. Hall of Marion County stated, "There is great propriety in the provision that is sought to be incorporated here with a view to have representation from the different localities in order to represent local interest and prevent the stronger counties overpowering the weaker and monopolizing ...."

This concern with the adequate representation of local interests is also reflected in the debates surrounding adoption of the one year durational residency requirement found in West Virginia Constitution art. VI, § 12. For example, in support of a proposed two year durational residency requirement, Delegate E.B. Hall of Marion County stated:

> I think people ought to know long, well and thoroughly the men they entrust their interest to in any of these public capacities. We know that in the very nature of the people of the country, every honest man thinks because he is honest everybody else is honest. A man approaches him is plausible, loves him and loves his children, kisses them all—and the wife too perhaps—palavers, and reaches them by a means that no man who is fit for a position would resort to. Yet that is the common machinery by which men attain positions or office. Now, sir, I want to be rid of it. I wish we could incorporate a clause that no man who ever seeks office should have it; and let offices seek men, and not men seek offices. I want to put a barrier up to these traveling politicians, and this is

the very thing that will do it. Many a man can run very well for thirty days or for one year who could not stand the test of two years acquaintance to save him; and I want every man to be tried and to be known; and I want that he shall remain in the community, district or whatever he proposes to represent so long that he will not only have an interest, not only know something of what are the interests and wishes of that people, but that he will have an identity of interests with them; that he may represent himself as well as them.... If these travelling office seekers are so hungry that they cannot live among the people two years, let them go to some other state or stay where they are.

1 DEBATES AND PROCEEDINGS OF THE FIRST CONSTITUTIONAL CONVENTION OF WEST VIRGINIA 789–90 (1861–1863). Given Delegate Hall's perspective on the need for adequate representation of local interests, it is not surprising that he was one of the primary supporters of both provisions, incorporated into the West Virginia Constitution of 1863, which preceded West Virginia Constitution art. VI, §§ 4 and 12.

■ Turning to the issue of the meaning of the term "resident" as used in West Virginia Constitution art. VI, § 12, we note initially that in West Virginia, the term "residence" is synonymous with the term "domicile" for election law purposes. *See Irons v. Fry*, 129 W.Va. 284, 290, 40 S.E.2d 340, 343 (1946). This is also the case in a number of other jurisdictions. *See Carrington v. Rash*, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675, 680 (1965); *Hadnott v. Amos*, 320 F.Supp. 107, 114 (M.D. Ala.1970), *aff'd*, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971) and 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972); *Osborn v. O'Barr*, 401 So.2d 773, 775 (Ala.1981); *Dane v. Board of Registrars*, 374 Mass. 152, 161, 371 N.E.2d 1358, 1364 (1978); *Hubbard v. McKey*, 193 So.2d 129, 132 (Miss.1966); *Berry v. Wilcox*, 44 Neb. 82, 85, 62 N.W. 249, 250 (1895); *Williams v. Commonwealth*, 116 Va. 272, 277, 81 S.E. 61, 63 (1914); *Kempster v. Milwaukee*, 97

Wis. 343, 347, 72 N.W. 743, 744 (1897). Similarly, this Court has used the terms "residence" and "domicile" interchangeably in the probate and domestic relations contexts. *See State ex rel. Lynn v. Eddy,* 152 W.Va. 345, 351–52, 163 S.E.2d 472, 476–77 (1968); *State ex rel. Linger v. County Court,* 150 W.Va. 207, 228, 144 S.E.2d 689, 703 (1965); *Tate v. Tate,* 149 W.Va. 591, 595, 142 S.E.2d 751, 753 (1965); *Hartman v. Hartman,* 132 W.Va. 728, 734, 53 S.E.2d 407, 410 (1949); *Gardner v. Gardner,* 144 W.Va. 630, 638, 110 S.E.2d 495, 500 (1959); *Sutton v. Sutton,* 128 W.Va. 290, 293, 36 S.E.2d 608, 610 (1946); *Taylor v. Taylor,* 128 W.Va. 198, 204, 36 S.E.2d 601, 604 (1946); *Boos v. Boos,* 93 W.Va. 727, 731, 117 S.E. 616, 618 (1923); *see also Lotz v. Atamaniuk,* 304 S.E.2d 20, 23 (W.Va.1983). Therefore, in our current discussion of the issue of domicile, several of our past cases will refer to "residence" where "domicile" is actually appropriate.

◼ Recently, in Syllabus Point 1 of *Lotz v. Atamaniuk, supra,* this Court defined "domicile" as follows: "Domicile is a combination of residence (or presence) and an intention of remaining." *See also Shaw v. Shaw,* 155 W.Va. 712, 716, 187 S.E.2d 124, 127 (1972); *State ex rel. Lynn v. Eddy,* 152 W.Va. at 351, 163 S.E.2d at 476–77; *Irons v. Fry,* 129 W.Va. at 290, 40 S.E.2d at 343; *Sutton v. Sutton,* 128 W.Va. at 296, 36 S.E.2d at 611; *Taylor v. Taylor,* 128 W.Va. at 204; 36 S.E.2d at 604; *Ward v. Ward,* 115 W.Va. 429, 431, 176 S.E. 708, 709 (1934); *Lyon v. Vance,* 46 W.Va. 781, 782–83, 34 S.E. 761, 761 (1899); *White v. Tennant,* 31 W.Va. 790, 791–92, 8 S.E. 596, 597 (1888). Similarly, in *State ex rel. Linger v. County Court,* 150 W.Va. at 227, 144 S.E.2d at 702–03, *quoting* 77 C.J.S.

*Residence* 295 (1952), in the context of a divorce proceeding, this Court stated:

"Two fundamental elements are essential to create a residence, and these elements are: (1) Bodily presence in a place. (2) The intention of remaining in that place. Residence is thus made up of fact and intention, the fact of abode and the intention of remaining, and is a combination of acts and intention. Neither bodily presence nor intention alone will suffice to create a residence. There must be a combination and concurrence of these elements and when they occur, a residence is created."

We must now analyze each candidate's individual circumstances to determine their respective places of domicile under this physical presence/intent to remain standard.[5]

Candidate Manchin concedes, in a memorandum submitted to this Court, that he purchased and moved into a dwelling located on Colfax Road in an area of Marion County known as Whitehall in 1970. He also confesses that "he has occupied that home from 1970 until the present." Until 1982, Whitehall was located in the 14th Senatorial District. *See* West Virginia Code § 1–2–1(d)(14) (1979 Replacement Vol.). In 1982, however, Whitehall was placed in the 13th Senatorial District pursuant to the Senate Redistricting Act of 1982. *See* West Virginia Code § 1–2–1(d)(13) (1983 Supp.).

Despite this admission by candidate Manchin that he occupies a dwelling, along with his wife and children as indicated by the record, in the 13th Senatorial District, he asserts that because the majority of his economic, cultural, and civic ties are in Farmington, which is located in the 14th Senatorial District, he is not disqualified

---

5. We note that there are no constitutional county or district residency requirements for officials elected on a statewide basis. Courts have held that a different domicile standard applies to such officials, who by the nature of their duties are required to work at the state capital. Such officials are ordinarily not deemed to have abandoned their original domicile even though they may be living with their family at the capital city. *See generally District of Columbia v. Murphy,* 314 U.S. 441, 454–55, 62 S.Ct. 303, 309, 86 L.Ed. 329 (1941); *Sweeney v. District of Columbia,* 113 F.2d 25, 32 (D.C.Cir.), *cert. denied,* 310 U.S. 631, 60 S.Ct. 1082, 84 L.Ed. 1402 (1940); *Richardson v. Richardson,* 258 Ala. 423, 426, 63 So.2d 364, 367 (1953); *Mitchell v. State Tax Comm'r,* 42 Del. 589, 596–97, 42 A.2d 19, 22 (1945); *Gallagher v. Board of Supervisors of Elections,* 219 Md. 192, 207–08, 148 A.2d 390, 399 (1959); *Bilbo v. Bilbo,* 180 Miss. 536, 549–50, 177 So. 772, 776 (1938); *Houston Printing Co. v. Tennant,* 120 Tex. 539, 545–46, 39 S.W.2d 1089, 1091 (1931).

under West Virginia Constitution art. VI, § 12. In essence, candidate Manchin contends that these ties make him a de jure resident of the 14th Senatorial District even though his de facto place of abode is in the 13th Senatorial District.

Candidate Manchin was born in Farmington, and lived there until the age of eighteen when he left to attend West Virginia University in Morgantown, Monongalia County, which is also located in the 14th Senatorial District. Thereafter, he lived in Farmington for a time before moving to the Colfax Road dwelling, which is located seven or eight miles on a direct line, and much farther by improved road, from Farmington, according to a map of Marion County prepared by the West Virginia Department of Highways. Candidate Manchin currently owns businesses in Farmington and Fairmont, from which he conducts all of his business affairs, and pays business and occupation taxes in the 14th Senatorial District. He spends a great portion of the business day in Farmington. He also owns substantial property in Farmington, including burial plots and a dwelling occupied by his aunt, where he occasionally sleeps. He rents a post office box in Farmington at which he receives the bulk of his business correspondence and which is listed as his address on his current driver's license, automobile registration, and boat registration. He is also active in business and community affairs, and attends church, in Farmington. Finally, he is registered to vote in the 14th Senatorial District.[6]

These substantial links with the community of Farmington, however, do not change the undisputed fact that candidate Manchin maintains and occupies a dwelling house only in the 13th Senatorial District. In the 1983–1984 Manual of the Senate and House of Delegates, published by the West Virginia Legislature, candidate Manchin's "home" address is listed as "Rt. 7, Box 146, Fairmont 26554," which is the address of his Colfax Road dwelling. This publication also lists candidate Manchin's "home" telephone number as "366–4761," which, according to the most recent telephone directory, corresponds to his Colfax Road address. Additionally, as of July 1, 1983, candidate Manchin's personal property was listed on the tax books of Marion County in the magisterial district in which Whitehall is located.

Unquestionably, candidate Manchin has substantial economic, cultural, and civic ties with Farmington in the 14th Senatorial District. Not surprisingly, he was able to submit several affidavits from residents of Farmington which stated, in effect, that he is frequently seen in Farmington and that he considers Farmington his "home." Even if candidate Manchin arguably considers Farmington to be his permanent place of residence, the record clearly and unequivocally demonstrates that his permanent place of physical residence is with his wife and children at the dwelling located on Colfax Road, Whitehall, Marion County.

In *Sutton v. Sutton*, 128 W.Va. at 296–97, 36 S.E.2d at 612, this Court rejected a similar contention that economic, cultural, and civic ties with a particular community are sufficient to establish domicile, stating:

> A man may remove from his place of residence and establish a domicile or residence elsewhere, and still own property, have important business or financial connections, leave his investments undisturbed, and even plan for his own burial, in a community in which he lived for a long period of time, without continuing to be a resident of the locality which he has left with the intention of staying away indefinitely.

6. Prior to May 3, 1983, candidate Manchin's voter's registration listed the Colfax Road dwelling at his residence. After discovering that Whitehall had been moved into the 13th Senatorial District, however, he changed his voter's registration to the 14th Senatorial District on May 3, 1983, listing his address as his post office box in Farmington. We note that West Virginia Code § 3–1–3 (1983 Supp.) provides that, "Citizens of the State shall be entitled to vote at all elections held within the precincts of the counties and municipalities in which they respectively reside." Because candidate Manchin does not "reside" at this post office box address, he is not properly registered to vote. We also note that although voter registration can create a presumption of residing in a particular locale, it is not conclusive and may be rebutted. *Jardine v. Intehar*, 213 F.Supp. 598, 600 (S.D.W.Va. 1963).

Candidate Manchin admits that he has occupied the house on Colfax Road continuously since 1970. His post office box in Farmington is not a place of residence. Candidate Manchin has failed to pass the physical presence prong of our test for domicile set forth in Syllabus Point 1 of *Lotz v. Atamaniuk, supra.* We therefore hold that candidate Manchin is not a "resident" of the 14th Senatorial District under West Virginia Constitution art. VI, § 12.

Candidate Polan admits, in a deposition submitted to this Court, that he has maintained an apartment in the Prichard Building, which is located in Cabell County, since 1972. The Prichard Building [hereinafter "The Prichard"] is owned by the Polan Realty Company, of which candidate Polan is vice president and general manager. Until 1983, this high rise residential apartment/office building contained the main offices of Polan Realty. In May 1983, however, Polan Realty transferred its main offices to a building located at 909 Camden Road in the Wayne County area of Huntington, although it continues to maintain an office in The Prichard. The first floor of what candidate Polan describes in his deposition as an "office building" located at 909 Camden Road is occupied by the Applied Mining Equipment and Service Company, of which the Polan Realty Company has an eighty percent ownership interest according to candidate Polan. On the second floor, two rooms are occupied by the Applied Mining Equipment and Service Company as office space; three rooms are occupied by the Polan Realty Company as office space; one room was vacated in April 1984 by the Quality Welding Company; one room is used for storage; and one room is what candidate Polan describes as "my sleeping quarters."

The building at 909 Camden Road in which candidate Polan claims to reside is a two story brick building, zoned industrial, located in a predominately industrial area in the city of Huntington.[7] As photographs introduced as exhibits in candidate Polan's deposition depict, the exterior of this building reflects the industrial purposes for which it is used, and for which it is zoned. The photographs also show a steel fabricating factory which is located attendant and adjacent to the 909 Camden Road building. Photographs of the interior of the building further reflect the commercial/industrial nature of the building. A receptionist's station by the main entrance to the building is displayed. Office bulletin boards, public ash cans, and other commercial paraphernalia are readily visible. On the second floor, a narrow corridor, with the entrances to various offices, is pictured, as well as a public water fountain, the entrance to two public restrooms, and the entrance to candidate Polan's "sleeping quarters."

Candidate Polan described the first photograph introduced depicting his alleged residence at 909 Camden Road as follows: "No. 6 is a photograph of my sleeping quarters at 909 Camden Road. It shows a dresser, some clothing, some photographs, television, part of the bed." It is interesting to note the absence of the adjective "my" in candidate Polan's description of the room's contents. Also conspicuously absent in candidate Polan's testimony are such terms as "home," "apartment," or "where I live." Candidate Polan described another photograph of his "sleeping quarters" as follows: "No. 8 is another photograph of my sleeping quarters. It shows a bed, lamp, small table, a couple of chairs, dresser, television, photographs, some clothing, a couple pairs of shoes." Candidate Polan also described another photograph introduced as follows: "Photograph No. 7 is a picture of the bathroom, one of two bathrooms on the second floor, and indicates a lavatory, a commode and a shower." Candidate Polan testified that this bathroom is not adjacent to his "sleeping quarters," but is located down the corridor, and is used by those working in the building and by members of the general public there on business.

---

7. We are introduced to this building in candidate Polan's exhibit 1, a photograph taken on May 24, 1984, showing the building and a Chevrolet truck parked outside containing a load which includes a chair and a table.

In contrast to the rather spartan accommodations of candidate Polan's "sleeping quarters" at 909 Camden Road, his testimony indicates that his apartment in The Prichard is far better furnished, although he has not supplied photographs of its interior as he has in the case of his "sleeping quarters." He states that his apartment in The Prichard contains a refrigerator, a stove, a sink, a television, a stereo, living room furniture, most of his personal effects, and most of his clothing. Although candidate Polan has lived in various apartments contained within The Prichard, formerly a high rise hotel in the center of the city of Huntington, he states that he has lived in the one which he currently maintains for five years. Although The Prichard does currently contain some office space, it also contains apartments. Although he has occasionally entertained at his apartment at The Prichard, he admits that he has never entertained at his one room sleeping quarters at 909 Camden Road. He also admits in a sworn affidavit submitted to this Court that he continues to sleep occasionally at his apartment in The Prichard.

Because candidate Polan is unmarried, many of the normal indicia of residence are lacking at both places. In this respect, as this Court stated in *First National Bank of Hinton v. Tate*, 116 W.Va. 138, 142, 178 S.E. 807, 810 (1935): "Fixing the place of domicile of a single man, perhaps without church, lodge, social or community interest, is particularly difficult." Similarly, because Polan Realty owns both buildings, other economic indicia of domicile are lacking. For example, candidate Polan pays no rent or utilities, with the exception of his telephone which is listed at his address at The Prichard, and which has been listed in his name since 1970 according to his own testimony, at either location. He does not have a personal telephone at his "sleeping quarters." He does not receive his personal mail at either address, but receives it at either his personal post office box or at his place of business. Although candidate Polan is registered to vote in Wayne County, listing 909 Camden Road as his address, standing alone it is not evidence of physical presence of a character constituting domicile. Of the five affidavits submitted in support of candidate Polan's alleged residency, not one contains any statement that he "lives," "resides," "abides," "dwells," "stays," or "has settled" at 909 Camden Road. No one refers to his "sleeping quarters" as his "home," or even his "apartment." The Court is impressed that the affidavits are crafted to avoid these representations.

▌ We are guided not only by the physical presence/intent to remain standard set forth in Syllabus Point 1 of *Lotz v. Atamaniuk, supra*, but also by Syllabus Point 4 of *Shaw v. Shaw, supra*, where this Court stated, "The important facts in determining the domicile of a person who has more than one residence are the physical character of each, the time spent and the things done in each place, and whether or not there is an intention to return to the original domicile." The basic theme of candidate Polan's contention that his place of domicile is at 909 Camden Road in Wayne is that he "has always maintained living quarters at or in close proximity to" his place of business. This Court rejected a similar argument in *Shaw v. Shaw, supra*, stating in Syllabus Point 3 that, "A change in residence for convenience in working conditions does not, without more, indicate a change in domicile." *See also McIntire v. Carpenter*, 202 So.2d 297, 300 (La.App. 1967) (rejecting a candidate's contention that he resided in his office which contained a small cot, a hot plate, and a refrigerator). Finally, we note that it is well established in this jurisdiction that, "A domicile once acquired is presumed to continue until it is shown to have been changed." *Hartman v. Hartman*, 132 W.Va. at 735, 53 S.E.2d at 410, *quoting Mitchell v. United States*, 88 U.S. (21 Wall.) 350, 353, 22 L.Ed. 584, 588 (1874); *see also Tate v. Tate*, 149 W.Va. at 595, 142 S.E.2d at 754; *Taylor v. Taylor*, 128 W.Va. at 204, 36 S.E.2d at 604; Syl. pt. 2, *First National Bank of Hinton v. Tate, supra*; Syl. pt. 3, *Maslin's Executors v. Hiett*, 37 W.Va. 15, 16 S.E. 437 (1892).

Intent to change domicile, which requires an intent not to return to the old domicile, is to be inferred from facts and circumstances, not from self-serving representations. It is difficult for this Court to reconcile candidate Polan's apparent affluence, deriving primarily from his position as vice president and general manager of Polan Realty, which the record reflects owns The Prichard, a high rise residential apartment/office building in the center of Huntington; The Coal Exchange Building, a high rise office building in the center of Huntington; 909 Camden Road, a two story industrial/office building with adjacent steel fabricating facilities; and other properties, with his contention that he has abandoned his fully furnished suite at The Prichard for one room "sleeping quarters" in an industrial building in an industrial area of the Wayne County section of the city of Huntington as his permanent place of residence.

Candidate Polan admits that he has occupied an apartment in The Prichard continuously since 1972. His one room "sleeping quarters" at 909 Camden Road is not his place of residence. Candidate Polan has failed to pass either prong of the physical presence/intent to remain test set forth in Syllabus Point 1 of *Lotz v. Atamaniuk, supra.* We therefore hold that candidate Polan is not a "resident" of Wayne County under West Virginia Constitution art. VI, § 12.

### III.

The final major issue raised in these mandamus actions is whether the respondent candidates will have been residents of the senatorial district and the county they respectively seek to represent "for one year next preceding" their election under West Virginia Constitution art. VI, § 12. In construing West Virginia Constitution art. VIII, § 23, now West Virginia Constitution art. IX, § 10, governing the election of county commissioners, this Court held in the single Syllabus Point of *Fansler v. Rightmire,* 115 W.Va. 492, 177 S.E. 288 (1934): "The word 'election,' as used in section 23, article 8, Constitution of

West Virginia, has reference to general elections—the final choice of the entire electorate—and not to the selection of candidates in a primary." As noted by the Court in *Fansler,* 115 W.Va. at 494, 177 S.E. at 289, "Candidates at the time of the adoption of our present Constitution were chosen by party conventions. A primary was not contemplated." *See also State ex rel. Brewer v. Wilson,* 151 W.Va. 113, 123, 150 S.E.2d 592, 598 (1966), *overruled on other grounds, Marra v. Zink,* 163 W.Va. at 408, 256 S.E.2d at 586. Likewise, the word "election," as used in West Virginia Constitution art. VI, § 12, refers to general elections and not to the selection of candidates in a primary. Therefore, in order to meet the durational residency requirement found in this constitutional provision, the respondent candidates must have established domicile in the senatorial district and the county which they respectively seek to represent one year prior to the impending November general election.

As we have already indicated, candidate Manchin is not currently domiciled in the 14th Senatorial District and candidate Polan is not currently domiciled in Wayne County in the 5th Senatorial District. Therefore, neither can become domiciled in the senatorial district and the county they respectively seek to represent for one year prior to the November general election.

Although candidate Manchin is extremely vague in his representations concerning when he supposedly established domicile in the 14th Senatorial District, candidate Polan clearly admits in his deposition that he did not establish his "sleeping quarters" at 909 Camden Road in Wayne County until March 1984, only eight months prior to the November general election. In response to the question, "When did you set up the room you referred to as your sleeping quarters?", candidate Polan answered, "Mid-March, 1984." Candidate Polan further states, "When I first moved my sleeping quarters in, the room that I now occupy had been a conference room. I had to dismantle that and remove a table and chairs ... in order to convert it." Until March 1984, there was no bed in candidate

Polan's "sleeping quarters," only a table and some chairs which were part of the "conference room." He maintained no apartment there. He admits in his deposition that he had never slept at 909 Camden Road until March 1984. All of the available rooms in the building were used either as office space or for storage according to candidate Polan's own testimony. Nowhere in the record does candidate Polan identify where he supposedly lived in the industrial/office building located at 909 Camden Road prior to March 1984. We also note that the record reflects that candidate Polan registered to vote in Wayne County using his 909 Camden Road address approximately six days before he established his "sleeping quarters" there, and then filed his certificate of candidacy approximately seven days after establishing his "sleeping quarters." Not only are candidate Polan's "sleeping quarters" insufficient to establish current domicile at 909

Camden Road in Wayne County, it is impossible for him to meet the one year durational residency requirement since he admits that he did not establish his "sleeping quarters" until March 1984.

Recognizing their inability to comply with the one year durational residency requirement, both candidates challenge its constitutionality under the equal protection clause of the fourteenth amendment, contending that it does not serve a compelling state interest.[8]

■ This Court has frequently recognized that the right to become a candidate for public office is a fundamental right, and that any restriction on the exercise of this right must serve a compelling state interest. *See Marra v. Zink*, 163 W.Va. at 404, 256 S.E.2d at 584; Syl. pt. 1, *State ex rel. Piccirillo v. City of Follansbee*, 160 W.Va. 329, 233 S.E.2d 419 (1977); *State ex*

---

**8.** Candidate Polan also contends that West Virginia Constitution art. VI, § 4, which requires that "where the [senatorial] district is composed of more than one county, both shall not be chosen from the same county," is unconstitutional under the equal protection clause of the fourteenth amendment. The essence of his argument is that because the Wayne County portion of the 5th Senatorial District contains a minority percentage of the total population of the district, the voters of Cabell County, as well as potential candidates for state senate also reside there, are unconstitutionally deprived of their right to be represented in proportion to their number by our state constitution's requirement that no two state senators in a multi-county senatorial district shall reside within the same county. The logical extension of this argument is that no state representative district could be composed of more than one county without violating the equal protection clause, since it is highly unlikely that every county in a state would have relatively equal populations. We are not of the opinion that the United States Constitution mandates single county senatorial districts. We are of the opinion that West Virginia Constitution art. VI, § 4 serves the compelling state interest of insuring meaningful representation for all of our counties in our state legislature.

On a related issue, we note that fifteen of the seventeen senatorial districts contain portions of counties within their boundaries. *See* West Virginia Code §§ 1–2–1(d)(1)–(17) (1983 Supp.). In fact, portions of Wayne County are included within three senatorial districts. *See* West Virginia Code §§ 1–2–1(d)(5), (6), and (7) (1983 Supp.). West Virginia Constitution art. VI, § 4

provides, in pertinent part, that "The [senatorial] districts shall be compact, formed of contiguous territory, *bounded by county lines*, and, as nearly as practicable, equal in population, to be ascertained by the census of the United States." [Emphasis added]. The Legislature recognized that its division of counties into separate senatorial districts was unconstitutional under this constitutional provision. It stated:

> The legislature finds and declares that it is not possible to divide the State into senatorial districts so as to achieve equality of population as near as is practicable as required by the United States supreme court and other federal courts and at the same time adhere to all of these provisions of the West Virginia Constitution ....

Noting that West Virginia Constitution art. VI, § 4 also provides that "the State shall be divided into twelve senatorial districts, which number shall not be diminished, but may be increased as hereinafter provided," we are of the opinion that senatorial districts could be drawn which would comply with both state and federal constitutional provisions. Instead of properly attacking the constitutionality of the Senate Redistricting Act of 1982, however, the respondent candidates attack the constitutionality of restraints upon that redistricting. In addition, although we are aware that the Legislature undertook its redistricting effort under the supervision of a federal district court, we are not advised of the details of its participation. Finally, we note that both respondent candidates were members of the Legislature at the time of the redistricting, and therefore must share the responsibility for its passage. Therefore, we decline to address this issue in this case.

*rel. Maloney v. McCartney,* 159 W.Va. at 516–517, 223 S.E.2d at 611; *State ex rel. Brewer v. Wilson,* 115 W.Va. at 121, 150 S.E.2d at 597. Therefore, strict scrutiny applies, whether under the equal protection clause of the fourteenth amendment or under the fundamental right to candidacy under our state constitution, requiring a compelling state interest to sustain our durational residency provision's constitutionality.

In *Marra v. Zink,* 163 W.Va. at 407, 256 S.E.2d at 586, this Court invalidated a city charter provision requiring members of city council to have been city residents for one year prior to their nomination. In so doing, we explicitly rejected contentions that such a provision served a compelling state interest. *Id.,* 163 W.Va. at 405, 256 S.E.2d at 585. This is relatively consistent with the majority of cases throughout the country which have invalidated *local* durational residency requirements, *see, e.g., Wellford v. Battaglia,* 485 F.2d 1151, 1152 (3d Cir.1973) (city charter); *Green v. McKeon,* 468 F.2d 883, 885 (6th Cir.1972) (city charter); *Lentini v. City of Kenner,* 479 F.Supp. 966, 970 (E.D.La.1979) (city charter); *Brill v. Carter,* 455 F.Supp. 172, 175 (D.Md.1978) (county charter); *Alexander v. Kammer,* 363 F.Supp. 324, 327 (E.D. Mich.1973) (city charter); *Thompson v. Mellon,* 9 Cal.3d 96, 105–06, 507 P.2d 628, 633, 107 Cal.Rptr. 20, 27 (1973) (city charter); *Cowan v. City of Aspen,* 181 Colo. 343, 350, 509 P.2d 1269, 1273 (1973) (city charter); *Castner v. Clerk of Grosse Pointe Park,* 86 Mich.App. 482, 496, 272 N.W.2d 693, 698–99 (1978) (city charter); *Phelan v. City of Buffalo,* 54 A.D.2d 262, 269, 388 N.Y.S.2d 469, 474 (1976) (city charter); *contra City of Akron v. Beil,* 660 F.2d 166, 169 (6th Cir.1981) (city charter); *Woodward v. City of Deerfield Beach,* 538 F.2d 1081, 1081 (5th Cir.1976) (city charter); *Joseph v. City of Birmingham,* 510 F.Supp. 1319, 1339 (E.D.Mich.1981) (city charter); *Brandenberg v. McCellan,* 427 F.Supp. 943, 945 (E.D.Mo.1977) (city charter); *Castner v. City of Homer,* 598 P.2d 953, 956–57 (Alaska 1979) (city code); *Triano v. Massion,* 109 Ariz. 506, 509, 513 P.2d 935, 938 (1973) (city charter); *Wise v. Lentini,* 374 So.2d 1286, 1287 (La.App.),

*cert. denied,* 375 So.2d 1182 (La.1979) (city charter); or state statutory durational residency requirements governing *local* public officials, *see, e.g., Henderson v. Fort Worth Ind. School Dist.,* 526 F.2d 286, 292–93 (5th Cir.1976) (school board member); *Headlee v. Franklin County Board of Elections,* 368 F.Supp. 999, 1004 (S.D. Ohio 1973) (village legislative authority); *McKinney v. Kaminsky,* 340 F.Supp. 289, 296 (M.D.Ala.1972) (county commissioner); *Mogk v. City of Detroit,* 335 F.Supp. 698, 701 (E.D.Mich.1971) (city charter commissioner); *Lucas v. Woodward,* 240 Ga. 770, 775, 243 S.E.2d 28, 31 (1978) (county commissioner); *Hall v. Miller,* 584 S.W.2d 51, 56 (Ky.App.1979) (mayor); *contra Howlett v. Salish and Kootenai Tribes,* 529 F.2d 233, 244 (9th Cir.1976) (tribal council member); *Russell v. Hathaway,* 423 F.Supp. 833, 838 (N.D.Tex.1976) (local school board member); *Daves v. City of Longwood,* 423 F.Supp. 503, 506 (M.D.Fla.1976) (city council); *Cahnmann v. Eckerty,* 40 Ill.App.3d 180, 181, 351 N.E.2d 580, 582 (1976), *appeal dismissed,* 431 U.S. 934, 97 S.Ct. 2644, 53 L.Ed.2d 252 (1977) (board of aldermen); *Stothers v. Martini,* 6 N.J. 560, 567, 79 A.2d 857, 860 (1951) (city commissioner); *DeHond v. Nyquist,* 65 Misc.2d 526, 530, 318 N.Y.S.2d 650, 655 (1971) (city school district board member); *Lawrence v. City of Issaquah,* 84 Wash.2d 146, 152, 524 P.2d 1347, 1350 (1974) (city council); *Fischnaller v. Thurston County,* 21 Wash.App. 280, 288–89, 584 P.2d 483, 487–88 (1978) (county home rule charter commission member).

On the other hand, courts have consistently upheld *state* constitutional durational residency requirements, *see, e.g., Sununu v. Stark,* 383 F.Supp. 1287, 1292 (D.N.H. 1974), *aff'd,* 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) (state constitution); *Chimento v. Stark,* 353 F.Supp. 1211, 1218 (D.N.H.), *aff'd,* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973) (state constitution); *Walker v. Yucht,* 352 F.Supp. 85, 99 (D.Del.1972) (state constitution); *Hadnott v. Amos,* 320 F.Supp. at 119 (state constitution); *Gilbert v. State,* 526 P.2d 1131, 1136 (Alaska 1974) (state constitution); *Griggers*

v. *Moye*, 246 Ga. 578, 581, 272 S.E.2d 262, 266 (1980) (state constitution); *Hayes v. Gill*, 52 Hawaii 251, 261, 473 P.2d 872, 877 (1970), *appeal dismissed*, 401 U.S. 968, 91 S.Ct. 1200, 28 L.Ed.2d 319 (1971) (state constitution); *State ex rel. Gralike v. Walsh*, 483 S.W.2d 70, 76 (Mo.1972) (state constitution); *Ammond v. Keating*, 150 N.J.Super. 5, 9, 374 A.2d 498, 500 (1977) (state constitution); *Hatcher v. Bell*, 521 S.W.2d 799, 804 (Tenn.1974) (state constitution); *contra Antonio v. Kirkpatrick*, 579 F.2d 1147, 1150–51 (8th Cir.1978) (ten year requirement for state auditor in state constitution); or state statutory requirements governing *state* officials, *see, e.g., Fleak v. Allman*, 420 F.Supp. 822, 825 (W.D.Okla. 1976) (state representative); *Draper v. Phelps*, 351 F.Supp. 677, 686 (W.D.Okla. 1972) (state representative); *Blount v. Board of Supervisors of Elections*, 247 Md. 342, 350, 230 A.2d 639, 643 (1967) (state constitutional convention delegate); *Hendrix v. State ex rel. Oklahoma State Election Board*, 554 P.2d 770, 772 (Okla. 1976) (state representative).

There are primarily three reasons why courts have upheld state constitutional and statutory durational residency requirements for state offices. First, these requirements promote candidate familiarity with the needs and problems of the people to be represented. Second, these requirements promote voter familiarity with the character, intelligence, and reputation of the candidates. Finally, durational residency requirements further the goal of precluding frivolous or fraudulent candidacies by those who are more interested in public office than in public service.

In *Draper v. Phelps*, 351 F.Supp. at 683, the court, in upholding a six month residency requirement in the representative district in which a candidate seeks election to the state legislature, stated, "Absent a durational residency requirement 'carpet bagger' candidates who have no desire, as agents or representatives of the district, genuinely to acquaint themselves with the problems of a representative district and conscientiously strive for the solution thereof in the legislature halls, can be candidates." *See also Woodward v. City of*

*Deerfield Beach*, 538 F.2d at 1083; *Howlett v. Salish and Kootenai Tribes*, 529 F.2d at 243; *Joseph v. City of Birmingham*, 510 F.Supp. at 1337; *Sununu v. Stark*, 383 F.Supp. at 1290; *Chimento v. Stark*, 353 F.Supp. at 1211; *Walker v. Yucht*, 352 F.Supp. at 98; *Gilbert v. State*, 526 P.2d at 1135; *Hayes v. Gill*, 473 P.2d at 877; *DeHond v. Nyquist*, 65 Misc.2d at 530, 318 N.Y.S.2d at 655; *Lawrence v. City of Issaquah*, 524 P.2d at 1349.

In *Gilbert v. State*, 526 P.2d at 1135, the Alaska Supreme Court, in upholding a three year residency requirement in the state and a one year residency requirement in the election district for state senate candidates, stated:

[I]t is most important that electors have a period in which they may become familiar with the character, habits and reputation of candidates for political office. Modern media campaigns and "packaged" candidates permit political hopefuls to campaign for office with little or no direct contact with the public they seek to serve. It is essential that voters have at least the opportunity to have some direct knowledge of their candidates in order to judge their sincerity and the truth of the claims under these aspirants for public office press forward through the media. It is a minimal requirement at best to ask a candidate to spend one year as a part of the community he hopes to represent in order to satisfy this need.

*See also Woodward v. City of Deerfield Beach*, 538 F.2d at 1083; *Sununu v. Stark*, 383 F.Supp. at 1290; *Joseph v. City of Birmingham*, 510 F.Supp. at 1337; *Chimento v. Stark*, 353 F.Supp. at 1217, *Walker v. Yucht*, 352 F.Supp. at 98; *Draper v. Phelps*, 351 F.Supp. at 683–84; *Hadnott v. Amos*, 320 F.Supp. at 120–21; *Hatcher v. Bell*, 521 S.W.2d at 804; *Lawrence v. City of Issaquah*, 524 P.2d at 1349.

Finally, in *Draper v. Phelps*, 351 F.Supp. at 677, the court stated:

The State has a compelling interest in preventing frivolous and fraudulent candidacy by persons who have had no previous exposure to the problems and desires

of the electorate of a representative district.... The State also has a compelling interest in requiring that those who expect to stand for the office of state representative take the matter seriously and make plans for their candidacy in advance of the election date. Serious candidates do usually have well-laid plans fashioned over a period of time.

See also Joseph v. City of Birmingham, 510 F.Supp. at 1337; Fleak v. Allman, 420 F.Supp. at 825; Sununu v. Stark, 383 F.Supp. at 1290; Chimento v. Stark, 353 F.Supp. at 1215.

We note that durational residency requirements have been struck down by the United States Supreme Court in Memorial Hospital v. Maricopa County, 415 U.S. 250, 269, 94 S.Ct. 1076, 1088, 39 L.Ed.2d 306, 321 (1974) (medical care); Dunn v. Blumstein, 405 U.S. 330, 360, 92 S.Ct. 995, 1012, 31 L.Ed.2d 274, 294 (1972) (voting in state elections); Oregon v. Mitchell, 400 U.S. 112, 117, 91 S.Ct. 260, 261, 27 L.Ed.2d 272, 277 (1970) (voting in federal elections); and, Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600, 617 (1969) (welfare benefits). We also recognize the intimate relationship between the interests of potential candidates and the interests of voters. As the United States Supreme Court stated in Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 99 (1972), "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlating effect on voters." See also Lubin v. Panish, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702, 708 (1974); Thompson v. Mellon, 9 Cal.3d at 100–01, 507 P.2d at 633, 107 Cal. Rptr. at 23–24. Despite the close proximity, however, between these two sets of interests, they are not identical, and must be dealt with accordingly. As the court stated in Hadnott v. Amos, 320 F.Supp. at 121:

Participation in the political process and freedom to move from place to place are overriding considerations in the case of the voter. His qualifications are minimal, and he need subject himself to the scrutiny of no one in the performance of his role in selection of public officers. Except in extraordinary cases the percentage of non-durational voters predictably is small. Democracy is flexible enough to stand the strain. The candidate is one of a much narrower group, in this case one of two persons. He must have the special capacities that will enable him to perform the office he seeks, and has possession of those capacities need to be exposed to those who will make the choice. Nonexposure of the narrower group—the candidates—with voters choosing from lack of knowledge, is a much more serious strain on the sinews of democracy.

Similarly, in Draper v. Phelps, 351 F.Supp. at 682, the court stated:

The fact is irrefutable that the likelihood of harm to the state interest is greater at the candidacy level than at the voter level. The interests of the state to be served by durational residency requirements at each level are not identical. The interests are different in kind. In casting his vote at an election the voter acts for himself alone; a representative ... acts, not for himself individually, but for the constituents of his district and the state.... There is also a difference in the degree of interest of the state. If the voter be not sufficiently informed to cast his vote meaningfully, the voter is primarily the loser. If a representative be not qualified, if he be not conversant with the wishes of his constituents and be not informed on the problems of his district insofar as they relate to matters before legislative assembly for consideration, the district and the state suffer— not he alone.

See also Joseph v. City of Birmingham, 510 F.Supp. at 1330–31; Sununu v. Stark, 383 F.Supp. at 1292; Chimento v. Stark, 353 F.Supp. at 1218; Gilbert v. State, 526 P.2d at 1135; Lawrence v. City of Issaquah, 84 Wash.2d at 151–52, 524 P.2d at 1349–50; Fischnaller v. Thurston County, 21 Wash.App. at 287, 584 P.2d at 487.

We therefore hold that the one year durational residency requirement for

state senators found in West Virginia Constitution art. VI, § 12 serves a compelling state interest and does not violate the fundamental constitutional rights of either candidates or voters. Accordingly, under West Virginia Constitution art. VI, § 12, candidate Manchin is ineligible to be elected to or to hold the office of state senator from the 14th Senatorial District since he will not have been a resident of that district for one year prior to the general election. Similarly, under West Virginia Constitution art. VI, §§ 4 and 12, candidate Polan is ineligible to be elected to or to hold the office of state senator from the 14th Senatorial District since he will not have been a resident of that district for one year prior to the general election. Similarly, under West Virginia Constitution art. VI, §§ 4 and 12, cnndidate Polan is ineligible Wayne County for one year prior to the general election.

IV.

For the foregoing reasons, we granted writs of mandamus commanding respondent A. James Manchin to withdraw his certification of candidacy of respondents Charles M. Polan, Jr. and Joe Manchin III; commanding the respondent Ballot Commissioners of Marion and Monongalia Counties and the respondent Ballot Commissioners of Cabell and Wayne Counties to strike, omit, or otherwise remove the names of Charles M. Polan, Jr. and Joe Manchin III, respectively, from the official ballots, ballot cards, or ballot labels, as the case may be, to be used in the primary election to be conducted on June 5, 1984, as candidates for the Democratic Party nomination to the office of state senator from the 5th and 14th Senatorial Districts; and commanding respondent A. James Manchin, under West Virginia Code § 3–1A–6 (1979 Replacement Vol.), to direct all election officials, county commissioners, clerks of county commissioners, clerks of circuit courts, boards of ballot commissioners, election commissioners, and poll clerks associated with the administration of the primary elections in the 5th and 14th Senatorial Districts to disregard and refrain from tallying, tabulating, certifying, or returning any vote cast, absentee, write-in, or otherwise, for respondents Charles M. Polan, Jr. and Joe Manchin III in these respective elections.

Writs granted.